Lᴉɴᴄᴏʟɴ Sᴀᴠɪɴɢs Bᴀɴᴋ, S.A., f/k/a Lincoln Savings and Loan Association, Petitioner-Respondent-Petitioner,

v.

Wɪsᴄᴏɴsɪɴ Dᴇᴘᴀʀᴛᴍᴇɴᴛ ᴏғ Rᴇᴠᴇɴᴜᴇ, Respondent-Appellant.

Supreme Court

*No. 96–0135. Oral argument October 7, 1997.—Decided January 27, 1998.*

(Also reported in 573 N.W.2d 522.)

For the petitioner-respondent-petitioner there were briefs by *Robert A. Schnur* and *Michael, Best & Friedrich*, Milwaukee and oral argument by *Robert A. Schnur*.

For the respondent-appellant the cause was argued by *Laura Sutherland*, assistant attorney general with whom on the brief was *James E. Doyle*, attorney general.

¶ 1. JANINE P. GESKE, J. This case presents a question of statutory interpretation. The taxpayer, Lincoln Savings Bank, S.A., (Lincoln) petitioned for review of a decision of the court of appeals,[1] which reversed an order of the circuit court for Milwaukee County, George A. Burns, Jr., Judge. The circuit court reversed a decision of the Tax Appeals Commission (Commission) which interpreted 1987 Wis. Act 27, § 3047(1)(a) to permit adjustment of bad debt reserves maintained by the taxpayer from 1962 until 1986, but not earlier, as a means of transitioning to the federalization of Wisconsin's income tax law. The Commission's interpretation upheld an assessment by the Department of Revenue (DOR) of additional franchise taxes and interest totalling $23,147.44 against Lincoln for the years 1987 to 1990, because Lincoln had adjusted for bad debt reserves maintained before 1962. We conclude that the Commission's interpretation of § 3047(1)(a) contravenes the intent of

---

[1] *Lincoln Savings Bank v. Wisconsin Dept. of Revenue*, 207 Wis. 2d 360, 558 N.W.2d 902 (1996).

the legislature as evidenced by the plain language of the transitional rule, and therefore the court of appeals erred in upholding the Commission's interpretation. We reverse.

## I.

¶ 2. The material facts are not in dispute.[2] Lincoln Savings Bank, S.A., formerly Lincoln Savings and Loan Association (Lincoln), is a state chartered savings bank, and has been subject to an annual state franchise tax since 1962. *See* Wis. Stat. § 71.23(2)(1995–96).[3] Under this provision, every domestic or foreign corporation is required to pay an annual franchise tax based on its entire Wisconsin net income from the preceding taxable year. *See id.* Lincoln

---

[2] The Tax Appeals Commission adopted the parties' stipulated facts as its findings.

[3] **Wis. Stat. § 71.23(2) (1995–96)** Franchise tax. For the privilege of exercising its franchise or doing business in this state in a corporate capacity, except as provided under sub. (3), every domestic or foreign corporation, except corporations specified in s. 71.26(1), . . .shall annually pay a franchise tax according to or measured by its entire Wisconsin net income for the preceding taxable year at the rate set forth in s. 71.27(2). In addition, except as provided in sub.(3) and s. 71.26(1), a corporation that ceases doing business in this state. . .shall pay a special franchise tax according to or measured by its entire Wisconsin net income of the taxable year during which the corporation ceases doing business in this state. . .at the rates under s. 71.27(2). Every corporation organized under the laws of this state shall be deemed to be residing within this state for the purposes of this franchise tax. All provisions of this chapter and ch. 73 relating to income taxation of corporations shall apply to franchise taxes imposed under this subsection, unless the context requires otherwise. The tax imposed by this subsection on national banking associations shall be in lieu of all taxes imposed by this state on national banking associations to the extent it is not permissible to tax such associations under federal law.

became liable to pay the franchise tax after Wis. Stat. § 71.01(3)(a) was amended in 1961 to no longer exempt savings and loan associations from taxation. *See* 1961 Wisconsin Act 620, § 6a.[4]

¶ 3.   Thrift institutions like Lincoln maintain accounts known as bad debt reserves or allowances. As counsel for Lincoln explained at oral argument, maintenance of a bad debt reserve is a system of income deferral, and does not constitute a permanent income reduction. A thrift institution makes yearly additions or subtractions to its bad debt reserves utilizing a formula that accounts for prior writeoffs and reserve additions, and its current level of lending activity. Bad debt reserves form the basis for the bad debt deduction, the primary way in which thrift

---

[4] Savings and loan associations had historically received favorable treatment under the federal taxation scheme as well, due to their role in the national priority of financing new home construction. *See* Kenneth R. Biederman and John A. Tuccillo, *Taxation and Regulation of the Savings and Loan Industry* 5 (1976). Thrifts first became subject to federal income taxation on January 1, 1952. Even after that date, thrift institutions still received relatively favorable tax treatment. *See* 8 *Mertens Law of Federal Income Taxation* § 30.114 at 273 (June 1997 update). For a general discussion of federal taxation of thrift institutions, see Rook, *Federal Income Taxation of Banks and Financial Institutions* § 13.03(3) (6th ed. 1990 & Supp. 1997 No. 1). However, starting in 1996, and pursuant to the Small Business Jobs Protection Act of 1996, Pub. L. 104–188, § 1616 (a), 110 Stat. 1755, thrift institutions became subject to the same federal tax provisions as commercial banks holding the same amount of total assets. *See* Ira L. Tannenbaum, *Bad Debt Legislation Clears Way for Thrifts Converting to Banks* 15 No. 16 Banking Pol'y Rep. 1 (Aug. 19, 1996).

institutions have reduced their tax burden since 1951, when they lost their federal tax-exempt status.[5]

¶ 4.  Both Wisconsin and federal tax laws permit thrift institutions to take bad debt deductions. The deduction amount is based on the amount of debt the thrifts can reasonably expect to become worthless during the tax year, and consequently lower their income tax liability. *See* Rook, *Federal Income Taxation of Banks and Financial Institutions*, ch. 13, § 13.03 (6th ed. 1990 & 1997 Supp. No. 1, § 13.03). Prior to 1987, Wisconsin tax law established a specific mechanism for this deduction. *See* Wis. Stat. § 71.04(9)(b) (1985–86).[6] Section 593 of the Internal Revenue Code contains the federal bad debt reserve deduction provision. *See* 26 U.S.C. § 593.[7]

---

[5] Biederman, at 3.

[6] **Wis. Stat. § 71.04(9)(b) (1985–86)**

Savings and loan associations, mutual savings banks, production credit associations and credit unions may make a deduction for a reasonable addition to reserve for bad debts of 2/3 of such sums as they are required to allocate to their loss reserves pursuant to statutory provisions or rules and regulations or orders of any state or federal governmental supervisory authorities.

[7] Under the federal scheme, there were two methods of computing this deduction, the reserve method, and the specific charge-off method. As described in Rook, at § 13.03(1), the reserve method usually resulted in the acceleration of deductions. A thrift that met the 60 percent qualifying asset test of § 7701(a)(19)(C) could compute its bad debt reserve under 26 U.S.C. § 593. Two types of reserve methods were applicable to qualifying real property loans: the experience method and the percentage of taxable income method. As provided by Pub. L. 104–188, the reserve method under 26 U.S. C. § 593(a)–(d) does not apply to any taxable year beginning after December 31, 1995. *See* 26 U.S.C. § 593(f) (1997 West. Supp.)

¶ 5. The federal bad debt reserve provisions for the years pertinent here allowed for the deduction of reasonable additions to the reserve at the discretion of the Internal Revenue Service. *See* 8 *Mertens Law of Federal Income Taxation* § 30.98 at 218:

> A deduction for an addition to a reserve was limited to an amount that bore a close relation to the taxpayer's business transactions in the first taxable year for which it was deducted, so that income for that year could not be established merely by showing that the balance in the reserve at the end of the year was reasonable. . . .The addition to the reserve for bad debts was not necessarily equivalent to the amount of debts that had become worthless within the taxable year. Where a specific account or accounts of a taxpayer became worthless, the full amount of such accounts could be included in the taxpayer's addition to its reserve for bad debts and deducted only if the aggregate addition to the bad debt reserve was reasonable.

¶ 6. Wisconsin's efforts to "federalize" its method of corporate income taxation affected the calculation of the bad debt deduction. The specific Wisconsin provision for deducting additions to bad debt reserves, Wis. Stat. § 71.04(9)(b) (1985–86), was repealed effective for the taxable year 1987 as part of the legislature's federalization of Wisconsin tax law. *See* 1987 Wis. Act 27, § 3203(47)(y). As part of the move to federalization, the legislature defined corporate "net income" for Wisconsin income tax purposes as "gross income, as computed under the internal revenue code." 1987 Wis. Act 27, § 1268k, amending Wis. Stat.

§ 71.02(1)(c)(intro.) (1985–86).[8] The former definition, in pertinent part, had read: " 'Net income' means, for corporations, 'gross income' less allowable deductions." *See* Wis. Stat. § 71.02(1)(c)(intro.) (1985–86). As the circuit court explained, "[t]he parties agree that 1987 Wisconsin Act 27, 'federalized' the Wisconsin income and franchise tax law so that a corporate taxpayer's federal net taxable income would become its Wisconsin net taxable income for years beginning in 1987, subject to other modifications which are not germane to this case." Mem. Decision at 3, Petitioner's App. at 113.

¶ 7. Prior to federalization, the method of applying bad debt reserves authorized by Wisconsin tax law was less favorable to the taxpayer than the method under the Internal Revenue Code. *See Lincoln Savings Bank*, 207 Wis. 2d at 363. The court of appeals explained by way of example that in 1962, Lincoln made an addition to its bad debt reserve for federal tax purposes of $31,561; Lincoln's 1962 addition to its bad debt reserve for Wisconsin tax purposes was $22,683. *See id.* In 1986, Lincoln made an addition to its bad debt reserve for federal tax purposes of $599,804; the addition to its bad debt reserve for Wisconsin tax purposes in that year was $320,268. For the years 1962 through 1986, Lincoln's total bad debt reserve balance for federal purposes equaled $3,684,766;[9] Lincoln's

---

[8] The new provision was recreated without material change as Wis. Stat. § 71.26(2)(a), currently in effect. *See* 1987 Wis. Act 312 and 1987 Wis. Act 312, § 16. Amendments not material here were made to Wis. Stat. § 71.26(2)(a), by 1987 Wis. Act 411, § 125.

[9] The court of appeals' opinion states that Lincoln's bad debt reserve balance for federal purposes, for the period of 1962–1986, was $3,375,023. *Lincoln Savings Bank*, 207 Wis. 2d at 363. The court of appeals reached that amount by deducting

total bad debt reserve balance for Wisconsin tax purposes, for that same period, was $2,668,622. Petitioner's App. at 105. For the years prior to 1962, Lincoln maintained a bad debt reserve only for federal purposes.

¶ 8. Wisconsin was not alone in its efforts to harmonize state corporate net income determinations with federal taxable income.[10] According to several commentators, "pressure from taxpayers for easing compliance and auditing burdens has been the prime force responsible for the very wide conformity of the State corporate net income measures to Federal

---

the $309,743 existing as Lincoln's bad debt reserve balance for federal purposes in 1961. That approach, however, begs the question. The Commission, which adopted the facts as stipulated by the parties, listed the 1986 balance for federal purposes as $3,684,766. Petitioner's App. at 105. We agree with the Commission's statement.

[10] Further, federalization was not solely a 1986 phenomenon. *See, e.g.*, Wis. Admin. Code § Tax 1.06 (1995) note: "Federalization of the computation of Wisconsin gross income for individuals and fiduciaries was provided by Chapter 163, Laws of 1965, effective for taxable year 1965 and thereafter." *See also, Cleaver v. Wis. Department of Revenue*, 151 Wis. 2d 896, 902–03, 447 N.W.2d 102 (Ct. App. 1989), describing the legislative history of the efforts of the Wisconsin legislature in 1961 and 1977 to federalize Wisconsin income tax law. For a description of earlier, almost nationwide efforts to conform, *see* Jerome R. Hellerstein, et al., 1 *State Taxation* § 7.03 n.38 (2d ed. 1993):

> According to Kenneth Back, Director of the Department of Finance and Revenue of the District of Columbia, and then President of the National Association of Tax Administration, in testimony given in 1973: "Forty states have adopted the federal tax base as the starting point for determining taxable income for state corporation income tax purposes or by administrative practice following the federal statute for all practical purposes." Mondale Comm. at 108.

taxable income, before allocation, apportionment, or other method of division of the income." Jerome R. Hellerstein, et al., *State Taxation*, vol. I, at § 7.02[1] (2d ed. 1993). According to Hellerstein, the most efficient method of achieving conformity with federal taxable income is for the state statute to incorporate by reference certain federal income tax terms, such as "gross income" and "taxable income," and then add certain qualifiers based on that state's particular fiscal policies. *Id.*

¶ 9. Federalization of the corporate tax liability in Wisconsin resulted in changes in the tax treatment of items of income, loss, or deduction for all corporations, including Lincoln.[11] The legislature enacted a transition mechanism to allow corporations to equalize those differences, but to avoid doing so abruptly. This non-statutory transition rule, 1987 Wis. Act 27, § 3047, provides for adjustments over a five-year period, beginning with 1987 unless the adjustment involved is $25,000 or less:

> SECTION 3047. **Nonstatutory provisions; revenue.**
> (1) TRANSITION; CORPORATIONS.
> (a) Each corporation shall calculate, as of the close of its taxable year 1986, the amount that, because of this act, is required to be added to, or subtracted from, income in order to avoid the double inclusion, or omission, of any item of income, loss or

---

[11] Lincoln's bad debt reserve for Wisconsin tax purposes of $2,668,662 as of December 31, 1986, was replaced by the amount of $3,684,766, Lincoln's bad debt reserve for federal purposes as of December 31, 1986. Thus, as a result of federalization, Lincoln's bad debt reserve for Wisconsin tax liability purposes was increased by over $1,000,000. The DOR only disputes the inclusion of $309,743 of that increase.

deduction, except that the adjustments required to the deductions for depreciation and amortization shall be made under section 71.02(1)(c)(intro.) of the statutes, as affected by this act. If the amount required to be added or subtracted is $25,000 or less, the proper amount shall be added or subtracted for taxable year 1987. If the amount required to be added or subtracted is more than $25,000, it shall be added or subtracted in amounts as nearly equal as possible over the 5 taxable years beginning with 1987, except that if the final taxable year that the corporation is subject to tax under chapter 71 of the statutes, as affected by this act, occurs before the total amount is added or subtracted all of the remaining amount shall be added or subtracted for that final taxable year.

¶ 10. The parties agree that Lincoln Savings Bank is a "corporation" as that word is used in § 3047(1)(a), and that the transitional rule required Lincoln to subtract the excess of its federal bad debt reserve over its Wisconsin bad debt reserve from Lincoln's Wisconsin tax liability. The parties only disagree as to whether Lincoln may subtract its pre–1962 balance of bad debt reserves for federal tax purposes, $309,743, which accumulated before Lincoln was subject to the Wisconsin franchise tax.

## II.

¶ 11. Although in this case we review a decision of the court of appeals, we are actually reviewing the decision of the Tax Appeals Commission. *See Richland School Dist. v. DILHR*, 174 Wis. 2d 878, 890, 498 N.W.2d 826 (1993). The Commission's decision interpreted 1987 Wis. Act 27, § 3047. Section 3047 is not a statute, but a non-codified legislative rule.

Legislative rule interpretation, like statutory interpretation, presents a question of law which this court reviews de novo. *See City of West Allis v. Sheedy*, 211 Wis. 2d 92, 96, 564 N.W.2d 708 (1997) (explaining that the goal of Supreme Court Rule interpretation, like the goal of statutory interpretation, is to give effect to the intent of the enacting body). Therefore, we will apply the standards for statutory interpretation to this case.

¶ 12. The purpose of statutory interpretation is to discern the intent of the legislature. *See State ex rel. Jacobus v. State*, 208 Wis. 2d 39, 47–48, 559 N.W.2d 900 (1997). To discern that intent, we first consider the language of the statute. If the language of the statute clearly and unambiguously sets forth the legislative intent, we apply that intent to the case at hand and do not look beyond the legislative language to ascertain its meaning. *See Kelley Co., Inc. v. Marquardt*, 172 Wis. 2d 234, 247, 493 N.W.2d 68 (1992); *see also UFE Inc. v. LIRC*, 201 Wis. 2d 274, 281–82, 548 N.W.2d 57 (1996).

¶ 13. The Commission did not determine whether § 3047(1)(a) was plain or ambiguous. The circuit court held the legislative rule to be plain and unambiguous. The court of appeals agreed, but interpreted the rule differently than did the circuit court. The parties themselves are inconsistent as to whether they perceive § 3047(1)(a) to be clear and unambiguous.[12] However, a statute is not rendered

---

[12] For example, Lincoln argues that the transition mechanism is remedial, and thus should be liberally construed. Petitioner's brief at 15. We do not invoke rules of statutory construction, however, unless we first determine that a statute is ambiguous. *See Department of Revenue v. Bailey-Bohrman*

ambiguous merely because the parties disagree as to its meaning. *UFE*, 201 Wis. 2d at 281–82. Nor is a statute rendered ambiguous if courts differ as to its meaning. *See State v. Moore*, 167 Wis. 2d 491, 497 n.6, 481 N.W.2d 633 (1992). A statute is ambiguous when it is capable of being understood in two or more different senses by reasonably well-informed persons. *See Wagner Mobil, Inc. v. City of Madison*, 190 Wis. 2d 585, 592, 527 N.W.2d 301 (1995). Only if it is ambiguous do we look to its scope, history, context, subject matter, and object to determine legislative intent. *See Cynthia E. v. La Crosse County Human Services Dep't*, 172 Wis. 2d 218, 225, 493 N.W.2d 56 (1992).

¶ 14. In this case we are asked to determine whether the legislature intended, when it enacted this non-codified transitional rule, to effectively insert the limitation that federalized adjustments be taken only for years in which the taxpayer was subject to a Wisconsin franchise tax. The Commission and the court of appeals read the transitional rule to limit adjustments to reserves accumulated since 1962, when Lincoln became subject to the Wisconsin franchise tax. The circuit court read the rule as applying without such limitation.

¶ 15. The DOR urges us to accord great weight deference to the Commission's interpretation of the transitional rule, because the Commission has

*Steel Corp.*, 93 Wis. 2d 602, 607, 287 N.W.2d 715 (1980). At oral argument, the DOR acknowledged that § 3047(1)(a) is plain on its face, and urged us to adopt the interpretation given by the court of appeals. Then, despite conceding the unambiguous language of the statute, the DOR also invokes rules of statutory construction by urging us to conclude that § 3047 provides for a tax deduction, and thus should be strictly construed against the taxpayer. Respondent's brief at 10.

abundant experience dealing with complex tax laws, and because it has "specialized knowledge and technical expertise necessary to interpret statutes which are designed to match income to expenses or deductions in order to avoid double deductions or double inclusions of income," which, according to DOR, is the clear intent behind § 3047(1)(a). Respondent's brief at 8. Lincoln replies that we should not accord any weight to the Commission's interpretation, because the Commission has not interpreted this particular section before. Petitioner's brief at 11–12.

¶ 16. For a more fundamental reason, we will accord no deference to the Commission's interpretation of § 3047(1)(a). "[A]dministrative interpretation is only of significance where there is an ambiguity in the statute. It cannot overcome the plain wording of a statute where there is no ambiguity." *National Amusement Co. v. Wis. Dep't of Revenue,* 41 Wis. 2d 261, 274, 163 N.W.2d 625 (1969) (citation omitted). "The plain meaning of a statute takes precedence over all extrinsic sources and rules of construction, including agency interpretations. . .[E]ven if an agency interpretation is accorded the highest level of deference by a court, great weight, it will not be upheld if the interpretation directly contravenes the clear meaning of the statute." *UFE,* 201 Wis. 2d at 282 n.2. Also *see, Carrion Corp. v. Wis. Dep't of Revenue,* 179 Wis. 2d 254, 265–66 n.3, 507 N.W.2d 356 (Ct. App. 1993). Because we conclude that the transitional rule is clear and unambiguous, we will not give any deference to the Commission's interpretation of § 3047(1)(a) which directly contravenes that clear meaning.

¶ 17. Lincoln's position can be summarized as follows. Lincoln characterizes the transition mechanism as a remedy for the effects of Wisconsin's corporate federalization. Because § 3047 is a remedial provision, according to Lincoln, it should be construed broadly and in a manner designed to eliminate distortions that would otherwise occur as a consequence of federalization. Lincoln described those potential distortions in its brief to the circuit court as either an unjustified increase in a taxpayer's taxes, or an unjustified decrease in those taxes, to the extent those changes were caused solely by the 1987 federalization of the Wisconsin income tax system.

¶ 18. The DOR contends that the legislature never intended to remedy differences between federal and state bad debt reserves for the years before Lincoln was subject to a Wisconsin franchise tax, because there was no Wisconsin bad debt reserve prior to 1962. Specifically, the DOR refers to the rule's language, particularly the legislature's use of the term "omission," to assert that Lincoln's pre–1962 bad debt reserve difference could not have been omitted as a result of the Act, because such a difference did not exist.

¶ 19. While this case arises in the context of equalizing a particular deduction for a savings bank, the deduction for bad debt reserves, § 3047(1)(a) itself is a broad transitional mechanism, applicable to *all* Wisconsin corporations, as an attempt to avoid problems of double inclusion, or omission, of *any item* of income, loss or deduction, with limited exceptions for depreciation and amortization, arising *because of* the enactment of 1987 Wis. Act 27. On its face, the section contains no limitation as to the amount of an item of

income, loss, or deduction, nor as to the date of origination of an item of income, loss, or deduction. The transitional rule includes only the already noted exceptions for depreciation and amortization, and specifies the timing for adding or subtracting the amounts necessary to achieve equalization.

¶ 20.   Further, compliance with 1987 Wis. Act 27, § 1268k, is mandatory. Because of the imposition of federalization, corporations like Lincoln were required to adjust their bad debt reserves maintained for Wisconsin tax purposes, so that they equalled the bad debt reserves maintained for federal tax purposes. If a problem of omission, for example, arose from that adjustment to reserves, under § 3047(1)(a) the affected corporation was entitled to take the otherwise omitted deduction.

¶ 21.   A plain reading of § 3047(1)(a), therefore, demonstrates that 1987 Wis. Act 27 forced Lincoln to add to its bad debt reserve maintained for Wisconsin tax purposes. The Act focused on equalizing the corporate taxable income reported for Wisconsin purposes with that reported for federal purposes. Section 3047 did not consider what prior taxable events or accounting methods generated the differences existing at the time federalization went into effect. Therefore, the DOR's argument that Lincoln maintained $309,743 of bad debt reserves before it had taxable income for Wisconsin purposes, is beside the point. Section 3047(1)(a) imposes no condition or prerequisite as to why differences in reserves or other items of income, loss, or deduction existed at the time of federalization. The section simply states that if such a difference exists, because of this act, the corporation

may take steps over a five-year period to equalize the amounts, and thereby eliminate those differences.

¶ 22. The circuit court found the plain language of the transitional rule to convey the intent of the legislature:

> As I read the section, the Petitioner is *required* to subtract from income, ". . . *any* item of income, loss or *deduction* . . ." I find no ambiguity in the section as a whole and particularly no ambiguity in giving to the words "required" and "any" their plain meaning as they are synonymous with "mandated" or "directed" and "every item" or "all items" within the context of the section. . .I find absolutely no language in the section even remotely suggesting that the federal basis is to be altered under any set of circumstances, which the Commission's decision clearly requires.

Mem. Decision at 3–4, Petitioner's App. at 114–115.

¶ 23. The DOR argues that § 3047(1)(a) should be read to effectively include the limitation, "only for years in which a taxpayer was subject to a Wisconsin franchise tax." Certainly, other corporations to which § 3047(1)(a) applies were subject to Wisconsin franchise tax before 1962. But to read in the limitation the DOR proposes would frustrate the express legislative goal of equalizing the differences between items of income, loss, or deduction for Wisconsin and federal corporate income tax liability. To judicially insert such a limitation would impermissibly rewrite an already plain legislative rule.

¶ 24. Counsel for Lincoln pointed out in oral argument that the method of taxing bad debt reserves for savings and loans is distinct, and does not apply to all corporations, or even to all institutions with reserves. This distinct feature, however, does not

receive special treatment under the broad language of § 3047(1)(a) as the section applies to all Wisconsin corporations, regardless of type and regardless of the date on which they became subject to Wisconsin income tax law.

¶ 25. Lincoln also argues that some event, such as a change in its organizational status, may occur at some time in the future. If Lincoln is not permitted to equalize its entire federal bad debt reserve to its Wisconsin bad debt reserve, it may lose certain tax deductions in the course of a federal reserve "recapture." This result, according to Lincoln, would be contrary to the intent of the legislature when it enacted § 3047(1)(a). The DOR characterizes this argument by Lincoln as a hypothetical, designed to create a windfall for the taxpayer, and therefore not a sufficient basis on which to interpret the transitional rule in Lincoln's favor. The circuit court did not address Lincoln's prospective application arguments, and the court of appeals specifically declined to consider them. *See Lincoln Savings Bank*, 207 Wis. 2d at 367 n.7. Because we decide this case based on a plain reading of the transitional rule, we likewise need not hypothesize as to Lincoln's future business decisions and resulting tax treatment.

¶ 26. We do recognize, however, that recapture of income formerly held as a reserve is a prospect faced by many corporations when, for example, they change their organizational status or their method of accounting. Approaches to, and the effect of, recapture are featured in many articles, and have been the subject of congressional attention. *See, e.g.*, Thomas P. Vartanian, et al., *Tearing Down the Tax Wall Between Banks and Thrift Institutions*, 14 No. 20 Banking Pol'y Rep. 1, *16 (Oct. 16, 1995):

Under the proposed income tax regulations, every thrift would be required to recapture prior Section 593 benefits upon conversion to a bank charter. The converted thrifts would face the choice of one of the bad debt reserve deductions available to banks and a reported total tax bill of between $2 billion and $3 billion over the six-year recapture period.

When coupled with the additional charges for deposit insurance that proposed legislation would levy on thrifts, the current recapture rules could cause severe fiscal problems for the savings industry. The $6 billion or so needed to fully capitalize the SAIF represents about one year's net earnings for the thrift industry.

Adding these Section 593 recapture costs to the amounts that the savings industry already has paid to strengthen the SAIF - an 85 basis point special assessment, higher premiums and interest on so-called FICO bonds - would cause healthy thrifts to suffer a severe competitive disadvantage in the first year or two under the new system.

*See also*, H.R. Conf. Rep. No. 104–737, at 342–43 (1996), *reprinted in* 1996 U.S.C.C.A.N. 1834–35, discussing effect of conference agreement provisions of the Small Business Job Protection Act, Pub. L. 104–188, on treatment of recapture of bad debt reserves:

> [A] thrift institution that is treated as a large bank generally is required to recapture its post–1987 additions to its bad debt reserves, whether such additions are made pursuant to the percentage of taxable income method or the experience method. The timing of this recapture may be delayed for a one- or two-year period to the extent the residential loan requirement described below applies. . . . The

balance of the pre–1988 reserves is subject to the provisions of section 593(e), as modified by the conference agreement (requiring recapture in the case of certain excess distributions to, and redemptions of, shareholders). Thus, section 593(e) will apply to an institution regardless of whether the institution becomes a commercial bank or remains a thrift institution. In addition, the balances of the pre–1988 reserve and the supplemental reserve will be treated as tax attributes to which section 381 applies. The conferees expect that Treasury regulations will provide rules for the application of section 593(e) in the case of mergers, acquisitions, spin-offs, and other reorganizations of thrift and other institutions.

¶ 27. The record does not indicate that Lincoln changed its status or undertook recapture calculations for the years for which it is subject to the assessment of additional franchise taxes and interest at issue here. But our plain reading of the transitional rule, which allows corporations to avoid a double inclusion or omission of any item of income, loss, or deduction which would occur as a result of this federalization act, is consistent with a legislative intent to avoid such double inclusions or omissions when the corporation is subject to a recapture of reserves. Whether a Wisconsin corporation would be subject to recapture reserves in 1987 or in 1997, if a double inclusion or omission of any item of income, loss or deduction occurs as a result of 1987 Wis. Act 27, the corporation is entitled, and is required, to apply the transition mechanism of § 3047(1)(a).

¶ 28. In conclusion, the plain language of the rule gives effect to the intent of the legislature. That intent was to create a mechanism whereby all corporations

subject to income tax in Wisconsin at the time of enactment, could equalize their items of income, loss, or deduction as maintained for federal tax purposes, with those items as maintained for Wisconsin income tax purposes. For some corporate taxpayers, the legislature recognized that equalization would involve substantial sums, so § 3047(1)(a) permitted those corporations a transition period in order to acclimate to the changes wrought by federalization. For those corporations, equalization could be accomplished over five years. The Commission's interpretation of the transitional mechanism, which effectively read in a limitation on which deductions[13] could be equalized, contravenes the intent of the legislature as evidenced by the plain wording of the rule. We therefore cannot sustain the Commission's interpretation.

*By the Court.*—The decision of the court of appeals is reversed.

¶ 29. SHIRLEY S. ABRAHAMSON, CHIEF JUSTICE (*concurring*). I join the court in its mandate. I write separately to express my disagreement with the majority opinion's reliance on the plain meaning canon to interpret 1987 Wis. Act 27, § 3047(1)(a).

¶ 30.  The majority begins and ends its analysis of § 3047(1)(a) by relying on the plain meaning maxim of statutory interpretation: When statutory language is clear on its face, a court's sole function is to apply the statute according to its plain meaning.

¶ 31.  I agree with the majority that the primary source of statutory interpretation is the language of the statute. "The task of resolving the dispute over the

---

[13] We mean deductions other than those for depreciation and amortization already excepted by § 3047(1)(a).

meaning of [a statute] begins where all such inquiries must begin: with the language of the statute itself." *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989) (citing *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 685 (1985)).[1]

¶ 32.   The majority opinion concludes that the language of the statute is clear on its face, using a rule of construction often repeated in prior cases: "A statute is ambiguous when it is capable of being understood in two or more different senses by reasonably well-informed persons" but is not rendered ambiguous "if courts differ as to its meaning." Majority op. at 442.[2] This rule of construction, if taken at face value, means that a court need not consider judges and courts as reasonably well-informed persons. If judges and courts were considered reasonably well-informed persons, then under this rule of construction when they differed about a law's meaning, the law would be considered ambiguous.

¶ 33.   This rule of construction cannot be taken at face value or treated seriously. The rule is just a means to enable a court to ignore another court's or judge's

---

[1] I also agree with the majority that the purpose of statutory interpretation is to ascertain the intent of the legislature.

[2] The majority opinion also states that "a statute is not rendered ambiguous merely because the parties disagree as to its meaning." Majority op. at 441–442. When parties disagree, I would adopt the approach urged by Professor Hurst: "If on its face the text supports the position of one contestant, due regard to the text suggests that a substantial burden of persuasion should rest on the opponent to prove that the statute had a different meaning." J. Willard Hurst, *The Legislative Branch and the Supreme Court*, 5 U. Ark. L.J. 487, 789 (1982). *See also* J. Willard Hurst, *Dealing With Statutes* 49–50 (1982).

interpretation of a statute and to then set forth its interpretation without explanation. Declaring that a statute has a plain meaning and then stating what the plain meaning is avoids any discussion of how the statute should be interpreted.

¶ 34. For many years I have thought this rule—namely that just because judges differ about the meaning of a statute, the statute is not ambiguous—to be plainly foolish. I conclude that when courts or judges disagree about the interpretation of a law, the law is, by definition, capable of being understood in two or more different senses by reasonably well-informed persons even though one interpretation might on careful analysis seem more suitable to this court.

¶ 35. Section 3047(1)(a) does not explicitly govern bad debt reserve of a savings and loan association, the issue presented in this case. The Tax Appeals Commission, the circuit court and the court of appeals—all impartial, well-informed adjudicative bodies—disagreed over the meaning of § 3047(1)(a) with respect to the bad debt reserve in question. The Tax Appeals Commission and court of appeals interpreted § 3047(1)(a) against Lincoln Savings. The circuit court interpreted § 3047(1)(a) in Lincoln Savings's favor. Both the circuit court and the court of appeals declared § 3047(1)(a) to be plain and unambiguous but disagreed over what the plain meaning of § 3047(1)(a) is.

¶ 36. In my view this case cannot be resolved through reliance on the plain meaning rule alone, as the majority opinion suggests. I would instead decide this case by determining which interpretation of § 3047(1)(a) most clearly achieves the legislative goal of

changing from Wisconsin's old tax system to a federalized tax regime.[3]

¶ 37.  Prior to 1962 Lincoln Savings was subject to federal but not Wisconsin income tax. Between 1962 and 1987 both Wisconsin and federal tax law permitted savings and loans associations to set aside reserves to cover bad debts and to take deductions for bad debts. Each tax system used different calculations for the deductions, and the Wisconsin tax law was less favorable to taxpayers than the federal tax law in calculating the deductions.

¶ 38.  The 1987 Wisconsin federalization act required Wisconsin taxpayers to compute their taxable income based on federal tax law rather than Wisconsin tax law. The state legislature recognized that under federalization some taxpayers might lose deductions while others would escape taxation on income. Thus in 1987 the legislature enacted § 3047(1)(a), a transition rule to provide for adjustments over a five-year period. It is against this backdrop that this court must analyze the parties' interpretations of § 3047(1)(a).

¶ 39.  Each party's interpretation focuses on different language of § 3047(1)(a).

---

[3] Extrinsic matters such as the statute's context, subject matter, legislative history and the object to be accomplished assist in ascertaining legislative intent. This court has recognized that " '[i]t would be anomalous to close our minds to persuasive evidence of intention [of the legislature] on the ground that reasonable men could not differ as to the meaning of the words. . . .The meaning to be ascribed. . .can only be derived from a considered weighing of every relevant aid to construction.' " *State v. Hervey*, 113 Wis. 2d 634, 641 n.9, 335 N.W.2d 607 (1983) (quoting *United States v. Dickerson*, 310 U.S. 554, 562 (1940)).

¶ 40.   One interpretation of § 3047(1)(a) is that it applies to any double inclusion or omission of income or deduction arising "because of this act," that is, because of the 1987 federalization act. Under this interpretation § 3047(1)(a) is directed at remedying post–1986 tax distortions caused by the 1987 federalization act. Lincoln Savings urges this interpretation by arguing that an adjustment in its bad debt reserve is required to eliminate post–1986 distortions caused by federalization.

¶ 41.   Another interpretation of § 3047(1)(a) is that taxpayers are required to subtract from income any item of income, loss or deduction "*in order to avoid* the double inclusion, or *omission, of any* item of income, loss or *deduction*" (emphasis added). Under this reasoning Lincoln Savings's pre–1962 federal deductions were not omitted for Wisconsin tax purposes because Lincoln Savings was not subject to Wisconsin income tax before 1962. Under this view of § 3047(1)(a) Lincoln Savings cannot recoup the pre–1962 Wisconsin tax deductions.

¶ 42.   While both interpretations of § 3047(1)(a) are reasonable, I conclude that Lincoln Savings's interpretation of § 3047(1)(a) is more consistent with the state legislature's ultimate goals of federalization of Wisconsin corporate taxes and ameliorating the impact of changing to the post–1986 system of computing Wisconsin taxable income. I would therefore adopt Lincoln Savings's interpretation of § 3047(1)(a).

¶ 43.   For the foregoing reasons I join the court's mandate and write separately.

¶ 44. I am authorized to state that Justice William A. Bablitch, Justice Ann Walsh Bradley and Justice N. Patrick Crooks join this opinion.