Irene BLUMER, Petitioner-Appellant,

v.

WISCONSIN DEPARTMENT OF HEALTH AND FAMILY SERVI
CES, Respondent-Respondent.†

Court of Appeals

*No. 99–1053. Submitted on briefs January 11, 2000.—Decided
June 8, 2000.*

## 2000 WI App 150

(Also reported in 615 N.W.2d 647.)

†Petition to review denied.

On behalf of the petitioner-appellant, the cause was submitted on the briefs of *Mitchell Hagopian* of *Elder Law Center of the Coalition of Wisconsin Aging Groups* of Madison.

On behalf of the respondent-respondent, the cause was submitted on the brief of *James E. Doyle*, attorney general, and *Maureen McGlynn Flanagan*, assistant attorney general.

Brief of amicus curiae was filed by *Carol Wessels Plaisted* of *SeniorLAW* of Milwaukee on behalf of *Legal Action of Wisconsin, Inc.*

Before Dykman, P.J., Vergeront and Roggensack, JJ.

¶ 1. ROGGENSACK, J.  Irene Blumer appeals from a decision of the Department of Health and Family Services (DHFS) to deny her Medical Assistance (MA) benefits. Irene claims the hearing examiner erred in applying the "income-first" rule instead of the "resource-first" rule when determining whether to increase the community spouse resource allowance. The hearing examiner's decision was based on a provision found in the Wisconsin Statutes but not contained in federal law. Because we conclude that Wisconsin's income-first rule impermissibly conflicts with federal law, we reverse.

## BACKGROUND

¶ 2.  The facts of this case are not in dispute. Irene Blumer was admitted to a nursing home in 1994. In December 1996, she, through her husband, Burnett Blumer, applied for MA. The Green County Department of Human Services conducted an asset assessment to determine whether Irene was eligible for MA benefits. The assessment indicated that the couple had total assets of $145,644 in 1994 when Irene was admitted to the nursing home. The County set Burnett's community spouse resource allowance (CSRA) at $72,822, or one-half of the couple's non-exempt assets. Based upon this CSRA, the County established a total asset limit of $74,822—$72,822 for Burnett, as the community spouse, and $2,000 for Irene, as the institutionalized spouse, before Irene would be eligible for MA. The County then examined the current total assets of the couple as of the date the application for MA was made and concluded that the couple had assets

of $89,335. The County denied Irene's MA application because the Blumers were $14,513 above their asset limit of $74,822.

¶ 3.  Irene requested a hearing for the purpose of setting a higher CSRA. At the hearing, it was established that Burnett's share of assets generated $377.85 per month in interest and dividends. Combined with his social security payments and those from an annuity which Burnett held, the hearing examiner concluded that Burnett's total monthly income was $1,702.45. This amount is below the minimum monthly maintenance needs allowance (MMMNA) of $1,727 established by federal law as the minimum monthly income a community spouse would need to live independently. *See* 42 U.S.C. 1396r–5(d)(3) (1994).[1] Irene argued that because the CSRA set by the County did not have the capacity to generate sufficient income to meet Burnett's MMMNA, the examiner should have set a higher CSRA so that Burnett would have more assets to generate more income. Setting a higher CSRA would allow a transfer of assets to Burnett, thereby making Irene eligible for MA sooner.

¶ 4.  Based on WIS. STAT. § 49.455(8)(d) (1995–96),[2] the hearing examiner concluded that he could not raise the CSRA, thereby permitting a transfer of assets to Burnett, until Irene first made all of her income available to him. By imputing Irene's social security retirement income and her pension to Burnett, the hearing examiner concluded that he had a monthly

---

[1] All references to the United States Code are to the 1994 version. The sections pertinent to this opinion were not substantially changed from 1994 to 1996, when the application for benefits was made.

[2] All references to the Wisconsin Statutes are to the 1995–96 version unless otherwise noted.

income of more than $2,000, well above the MMMNA established by federal statute. Therefore, the hearing examiner determined that no additional assets above the initially established CSRA needed to be retained by Burnett, the community spouse, and that the County correctly had denied MA benefits to Irene. DILHR affirmed the decision of the hearing examiner. Irene petitioned the circuit court for review, and it affirmed the agency's decision in all respects. Irene appeals.

## DISCUSSION

**Standard of Review.**

¶ 5.   In an appeal of an administrative agency decision, we review the decision of the agency, not that of the circuit court. *See Lilly v. DHSS*, 198 Wis. 2d 729, 734, 543 N.W.2d 548, 550 (Ct. App. 1995). The interpretation and application of WIS. STAT. § 49.455 and 42 U.S.C. § 1396r–5 to undisputed facts are conclusions of law. *See Gordon v. State Med. Examining Bd.*, 225 Wis. 2d 552, 556, 593 N.W.2d 481, 483 (Ct. App. 1999), *review denied*, 228 Wis. 2d 168, 599 N.W.2d 409 (1999). Although we are not bound by an agency's conclusions of law, in certain instances we give an agency's conclusions one of three standards of deference: (1) great weight deference, (2) due weight deference, or (3) no deference. *See UFE Inc. v. LIRC*, 201 Wis. 2d 274, 284, 548 N.W.2d 57, 61 (1996). However, an administrative interpretation "is only of significance where there is an ambiguity in the statute. It cannot overcome the plain wording of a statute where there is no ambiguity." *Lincoln Sav. Bank, S.A. v. DOR*, 215 Wis. 2d 430, 443, 573 N.W.2d 522, 528 (1998) (citation omitted).

¶ 6.  DHFS argues that its interpretation of the applicable statutory provisions is entitled to, at minimum, due weight deference because it has interpreted the state and federal medical assistance statutes for more than a decade. Irene points out, however, that she does not contend that DHFS is misinterpreting a provision in the law. Instead, she argues that the state provision relied upon by DHFS to deny her benefits directly conflicts with federal law, which it may not do. *See* 42 U.S.C. § 1396a(a)(17)(A); *Schweiker v. Gray Panthers*, 453 U.S. 34, 37 (1981). When the matter was before the hearing examiner, it did not undertake any analysis of federal law but simply denied the benefits because of WIS. STAT. § 49.455(8)(d). Therefore, we agree with Irene that it is not the agency's interpretation of a statute that is at issue, but rather whether the state statute conflicts with federal law. Accordingly, we conclude that the appropriate standard of review is *de novo*.

**Overview of Medical Assistance.**

¶ 7.  Medical Assistance, also known as Medicaid, is a joint federal-state program that was established in 1965 as Title XIX of the Social Security Act. In addition to other benefits, the program provides coverage for elderly persons whose income and resources are insufficient to meet the costs of medical services, such as nursing home care. For states that participate in the program, such as Wisconsin, the federal government provides partial funding and establishes mandatory and optional categories of eligibility and services covered. Although states are given wide latitude to adopt standards for determining the extent of MA, no state may adopt programs or policies that violate a mandate

of the Act. *See* 42 U.S.C. § 1396a(a)(17)(A); *Schweiker*, 453 U.S. at 37.

¶ 8.  In 1988, Congress enacted the Medicare Catastrophic Coverage Act of 1988 (MCCA). *See* 42 U.S.C. § 1396r–5. The MCCA sought to protect married couples when one spouse was institutionalized in a nursing home so that the spouse who continued to reside in the community was not impoverished and had sufficient income and resources to live independently. *See* H.R. REP. No. 100–105(II), at 65 (1988), *reprinted in* 1988 U.S.C.C.A.N. 857, 888. Prior to 1988, the medical assistance eligibility rules required a couple to deplete their resources before the institutionalized spouse was eligible for benefits. This process often left the community spouse impoverished and unable to live without public assistance.

¶ 9.  The MCCA was designed to govern the calculation of both resources and income allocable to each spouse for purposes of Medicaid eligibility. It treats resources and income differently, and both need to be evaluated when determining whether an applicant is eligible for MA benefits. The term, "resources," is roughly equivalent to assets, while the term, "income," corresponds to the income-generating potential of those assets and to additional income such as social security or pension payments.

¶ 10.  When an application for MA is made, the couple's total resources are calculated as of the date that continuous institutionalization began for the institutionalized spouse, and then a share of those resources is allocated to each spouse.[3] The amount of

---

[3] Federal law requires that the asset assessment be conducted as of the date that continuous institutionalization began, not the date on which the application for MA was made. *See* 42 U.S.C. § 1396r–5(c)(1)(A).

resources allocated to the community spouse is called the community spouse resource allowance (CSRA). The CSRA is considered an unavailable asset in determining the MA eligibility of an institutionalized spouse.

¶ 11. When an application for MA is made, in addition to the CSRA, a community spouse is entitled to income in an amount sufficient to meet the minimum monthly maintenance needs allowance (MMMNA). *See* 42 U.S.C. § 1396r–5(d)(3); WIS. STAT. § 49.455(4). The MMMNA is designed to ensure that, if possible, the community spouse will have income (as opposed to resources) above the poverty level.[4] Both federal and state statutes incorporate the "name on the check" principle, whereby, at the time an application for MA is made, income is considered available only to the spouse in whose name the payment is made. *See* 42 U.S.C. § 1396r–5(b); § 49.455(3)(b). Payment made in the name of both spouses is equally divided, initially.

¶ 12. If either spouse is dissatisfied with the CSRA as set by the County, or if the community spouse's income is insufficient to meet the MMMNA, he or she may request a fair hearing. *See* 42 U.S.C. § 1396r–5(e); WIS. STAT. § 49.455(8). Section 49.455(8)(d) of the Wisconsin Statutes is critical to this appeal because it requires a hearing examiner to first impute all of the institutionalized spouse's income to the community spouse (income-first) if the community spouse's income is insufficient to meet the MMMNA, as opposed to transferring more of the couple's income-generating assets to the community spouse (resource-first) in order for that spouse to have sufficient income-generating capacity to meet the MMMNA.

---

[4] At the time of Irene's application, the MMMNA established by federal statute was $1,727 per month, which was 150% of the federal poverty line.

**The MA Application.**

¶ 13.  When income in Burnett's name was combined with the income-generating capacity of Burnett's CSRA, he had insufficient income to meet the MMMNA. The central issue in this case is whether the income-first approach used by the hearing examiner to supplement Burnett's MMMNA is in conflict with federal law. The federal provision at issue is found at 42 U.S.C. § 1396r–5(e)(2)(C), and it provides:

> **Revision of community spouse resource allowance.** If either such spouse establishes that the community spouse resource allowance (in relation to the amount of income generated by such an allowance) is inadequate to raise the community spouse's income to the minimum monthly maintenance needs allowance, there shall be substituted, for the community spouse resource allowance under subsection (f)(2) of this section, an amount adequate to provide such a minimum monthly maintenance needs allowance.

¶ 14.  Wisconsin's provision relative to requesting a new CSRA as established by a fair hearing is similar to the federal provision, and it provides:

> If either spouse establishes at a fair hearing that the community spouse resource allowance determined under sub. (6)(b) without a fair hearing does not generate enough income to raise the community spouse's income to the minimum monthly maintenance needs allowance under sub. (4)(c), the department shall establish an amount to be used under sub. (6)(b)3. that results in a community spouse resource allowance that generates enough income to raise the community spouse's income to the minimum monthly maintenance needs allowance under sub. (4)(c).

WISCONSIN STAT. § 49.455(8)(d). However, part of subsection (8)(d) is not found in federal law. It states:

> Except in exceptional cases which would result in financial duress for the community spouse, the department may not establish an amount to be used under sub. (6)(b)3. unless the institutionalized spouse makes available to the community spouse the maximum monthly income allowance permitted under sub. (4)(b) or, if the institutionalized spouse does not have sufficient income to make available to the community spouse the maximum monthly income allowance permitted under sub. (4)(b), unless the institutionalized spouse makes all of his or her income . . . available to the community spouse . . . .

Therefore, by enacting subsection (8)(d), the Wisconsin legislature mandated that DHFS adopt an income-first approach instead of a resource-first approach in determining whether to raise a community spouse's CSRA.

¶ 15. Irene contends that, when an application for MA is made, the plain language of the federal statute directs a state to increase the CSRA if the community spouse has income that is insufficient to meet the MMMNA. Therefore, Irene argues that WIS. STAT. § 49.455(8)(d), which requires the hearing examiner first to impute the institutionalized spouse's income to the community spouse, contravenes federal law and is invalid. She cites out-of-state cases which have so held. *See Gruber v. Ohio Dep't of Human Servs.,* 647 N.E.2d 861 (Ohio Ct. App. 1994); *Kimnach v. Ohio Dep't of Human Servs.,* 645 N.E.2d 825 (Ohio Ct. App. 1994).

¶ 16. DHFS contends, on the other hand, that the federal spousal impoverishment provisions found in 42 U.S.C. § 1396r–5 are ambiguous and that, while

income-first is not mandated under federal law, it is permissible. In support of its contention, the DHFS relies on its interpretation of the legislative history underlying these provisions and some of the informal interpretations by the federal agency charged with administering Medicaid. DHFS also cites several out-of-state cases in which courts have declared that the federal statute is ambiguous. *See, e.g., Cleary v. Waldman*, 959 F. Supp. 222, 228–29 (D.N.J. 1997); *Cleary v. Waldman*, 167 F.3d 801, 807 (3d Cir. 1999), *cert. denied*, 120 S. Ct. 170 (1999); *Chambers v. Ohio Dep't of Human Servs.*, 145 F.3d 793, 802 (6th Cir. 1998), *cert. denied*, 525 U.S. 964 (1998); *Golf v. New York State Dep't of Soc. Servs.*, 697 N.E.2d 555, 556–57 (N.Y. 1998).

¶ 17.   When we construe a statute, our aim is to ascertain the intent of the legislative body. *See Truttschel v. Martin*, 208 Wis. 2d 361, 365, 560 N.W.2d 315, 317 (Ct. App. 1997). In so doing, we begin with the plain meaning of the language chosen. *See id.* "If the language employed is clear and unambiguous, that is conclusive of legislative intent. Our inquiry ends, and we must apply the plain meaning of the statutes to the facts of this case." *Cemetery Servs., Inc. v. Department of Regulation & Licensing*, 221 Wis. 2d 817, 825, 586 N.W.2d 191, 195 (Ct. App. 1998), *review denied*, 225 Wis. 2d 488 (1999). Only if a statutory provision is ambiguous do we resort to rules of statutory construction, such as legislative history, to determine legislative intent. *See J.A.L. v. State*, 162 Wis. 2d 940, 962, 471 N.W.2d 493, 502 (1991). Additionally, a statute is not rendered ambiguous merely because the parties disagree as to its meaning. *See State v. Orlik*, 226 Wis. 2d 527, 534, 595 N.W.2d 468, 472 (Ct. App.

1999). And, legislative history may not be used to create an ambiguity in otherwise plain statutory language. *See Johnson v. County of Crawford,* 195 Wis. 2d 374, 383, 536 N.W.2d 167, 170 (Ct. App. 1995).

¶ 18. DHFS does not articulate why or how it believes 42 U.S.C. § 1396r–5(e)(2)(C) is ambiguous. Instead, it points to out-of-state cases that have examined the issue before us and have concluded that subsection (e)(2)(C) of the federal statute is ambiguous. A close review of those cases, however, reveals that the courts have stated their conclusions in broad strokes, such as opining that the spousal impoverishment provisions are complex, and therefore it is impossible to attach a plain meaning to any provision. While we may agree that these provisions are complex, we cannot agree that every provision is ambiguous simply because of the complexity of the statute as a whole.

¶ 19. Additionally, some courts, in reasoning that the statute is ambiguous, have seized upon the phrase, "community spouse's income," in 42 U.S.C. § 1396r–5(e)(2)(C) because that term is not specifically defined in the statute. They have concluded that it is reasonable to interpret "community spouse's income" as an amount that includes the imputation of income paid in the name of the institutionalized spouse. Based upon DHFS's citation of these cases, we view its assertion of ambiguity as a contention that the phrase, "community spouse's income," is ambiguous. We disagree.

■

¶ 20. First, the language of 42 U.S.C. § 1396r–5(e)(2)(C) mandates that if either spouse establishes that the CSRA is inadequate (in relation to the amount of income it has the capacity to generate) to raise the community spouse's income to the level of the

MMMNA, there shall be substituted a higher CSRA: "[t]here shall be substituted, for the community spouse resource allowance under (f)(2) of this section, an amount adequate to provide such a minimum monthly maintenance needs allowance." This language very specifically directs the increase of the CSRA to an amount sufficient to generate additional income to meet the MMMNA. No direct or specific language states that imputation of the institutionalized spouse's income should occur before raising the CSRA. Further, the language of the statute speaks of "the *community spouse's* income," not the couple's income or the community spouse's income plus the institutionalized spouse's income. This is consistent with the separate treatment of each spouse's income throughout § 1396r–5. Therefore, we conclude that the specific language of the statute contemplates that the hearing examiner will separate the community spouse's income from that of the institutionalized spouse and consider only the community spouse's income in its review of whether the CSRA that has been established is sufficient to avoid impoverishment of the community spouse.

¶ 21. Additionally, the CSRA is established only when the application of the institutionalized spouse is reviewed for MA eligibility. The statute provides that either spouse may request a hearing "if an application for benefits . . . has been made . . . ." *See* 42 U.S.C. § 1396r–5(e)(2)(A). Therefore, establishing the CSRA is a *pre-eligibility* determination, not a *post-eligibility* one. However, § 1396r–5(d)(1) directs the institutionalized spouse to transfer income to the community spouse only *after* eligibility has been determined, not before eligibility has been established. Section 1396r–5(d)(1) provides:

**Protecting income for community spouse. (1) Allowances to be offset from income of institutionalized spouse.** *After an institutionalized spouse is determined . . . to be eligible for medical assistance, . . .* there shall be deducted from the spouse's monthly income . . . [a] community spouse monthly income allowance . . . but only to the extent income of the institutionalized spouse is made available to (or for the benefit of) the community spouse.

(Emphasis added.) The community spouse monthly income allowance (CSMIA) is defined as the amount by which a community spouse's income is insufficient to meet the MMMNA. *See* § 1396r–5(d)(2). Stated another way, § 1396r–5(d) directs the institutionalized spouse to transfer income to the community spouse if the community spouse's income falls short of the MMMNA and relief for the community spouse was not available by permitting an increase in the CSRA because there were insufficient resources to generate the needed income.

¶ 22. The transfer referenced in 42 U.S.C. § 1396r–5(d)(1), however, occurs *after* the institutionalized spouse has been determined eligible for MA. *See* § 1396r–5(d)(1). And, as stated earlier, this transfer of income is unrelated to revising the CSRA, which occurs *prior* to a determination of eligibility. Because § 1396r–5(d) (relating to transferring income) is limited to post-eligibility determination transfers while increasing the CSRA pursuant to § 1396r–5(e)(2)(C) is not so limited, then increasing the CSRA via resources is the only method by which a community spouse can be afforded more income for the MMMNA at the time MA eligibility is being determined for the institutionalized spouse. *See Gruber,* 647 N.E.2d at 868–69 ("Since the

MMMNA must be met, and since Section 1396r–5(e)(2)(C) provides the only method to meet the MMMNA, the agency has no choice but to transfer over the amount of resources that is necessary to raise [the community spouse's] income level to meet the MMMNA").

¶ 23. Furthermore, DHFS's contention that the community spouse's income includes imputed income from the institutionalized spouse would require us to conclude that while Congress so clearly provided for the transfer of income from an institutionalized spouse to a community spouse after a determination of eligibility, it also meant to do so prior to a determination of eligibility simply by using the phrase, "community spouse's income." Such a reading is inconsistent with the care with which Congress specified whose income or resources were addressed in the other subsections of the statute. Additionally, in many instances, DHFS's interpretation would make 42 U.S.C. § 1396r–5(d)(1) superfluous because all possible transfers of income available to meet the community spouse's MMMNA would have occurred prior to a determination of eligibility and there would be nothing left to transfer after eligibility, the period of time specifically referenced in (d)(1). Therefore, we conclude that construing the term, "community spouse's income," to include a pre-eligibility transfer of income from the institutionalized spouse is contrary to the plain meaning of § 1396r–5(e)(2)(C). We also conclude that subsection 5(d)(1) provides for a shifting of income to the community spouse after eligibility has been determined when, even though all of the couple's assets have been transferred to the community

spouse, that spouse still does not have sufficient income-generating capacity to reach the MMMNA.[5]

¶ 24. Finally, the transfer of the couple's resources such that the community spouse's income will meet the MMMNA is consistent with the objectives of the spousal impoverishment provisions of the Act, *i.e.*, to assure that the community spouse will have income and resources sufficient to live independently of the institutionalized spouse without other forms of public assistance, if it is possible to do so. However, under the income-first approach requested by DHFS, a community spouse, like the one in this case, would become dependent upon income from the institutionalized spouse in order to meet his or her minimum monthly needs. Because that community spouse would be receiving income from the institutionalized spouse, more of the couple's resources would be spent down on the cost of nursing home care. However, if the institutionalized spouse dies first, the income that the community spouse receives from the institutionalized spouse would cease. Thereafter, the community spouse would be left with income that is, by default, less than the MMMNA set by federal statute (because otherwise, the institutionalized spouse would not have transferred income to the community spouse). In short, under the income-first rule, once the institutionalized spouse dies, the community spouse will be left impover-

[5] That type of situation is likely to occur when a homemaker who has not worked outside of the home becomes a community spouse, thereby having very little income in his or her name alone, and, as a couple, there are few assets. In order to avoid impoverishment, such a spouse then may require a transfer of both resources and income from the institutionalized spouse in order to meet the community spouse's MMMNA.

ished, without either the assets or the income necessary to assure independence.

¶ 25. However, under the resource-first rule, a community spouse may receive more of the couple's income-generating assets. Thereafter, if the institutionalized spouse dies, the community spouse continues to have resources to use for self-support. This furthers the purpose behind the spousal impoverishment provisions of the MCCA, which is to allow the community spouse to live independently. Congress knew that to take all of the community spouse's assets to pay for the institutionalized spouse's nursing home care would be short-sighted because the community spouse would need to turn to other public assistance programs to survive once the institutionalized spouse died. And, reliance on public assistance by the community spouse had been a result of spousal impoverishment, which the MCCA sought to change.

¶ 26. We are also unpersuaded by other arguments made by DHFS. For example, DHFS urges us to consider the legislative history of the spousal impoverishment provisions because it believes that the legislative history supports an income-first approach. However, we do not look at the legislative history of a statute unless we conclude that it is ambiguous. *See J.A.L.*, 162 Wis. 2d at 962, 471 N.W.2d at 502. Additionally, as stated above, legislative history may not be used to create an ambiguity in otherwise plain statutory language. *See Johnson*, 195 Wis. 2d at 383, 536 N.W.2d at 170.[6] Because we conclude the statute is

---

[6] Additionally, we note that opponents of the income-first rule point to the same legislative history for support of their claim that a resource-first approach is mandated. The legislative history is, at best, inconclusive.

unambiguous, we cannot examine the legislative history.

¶ 27. Similarly, DHFS also asks us to consider several letters from the United States Department of Health and Human Services (DHHS), the federal agency charged with administering the Medicaid program. However, we do not look to other sources to interpret a statute if its language is clear on its face. Additionally, we note that DHHS has not interpreted the statute consistently.

¶ 28. Finally, DHFS argues that, while one of the chief purposes of the MCCA was to end spousal impoverishment, another purpose was to limit the use of public funds to support the institutionalized care of those who could afford to pay for their health care. DHFS contends that a resource-first rule allows couples to shelter excessive amounts of assets. However, this argument ignores 42 U.S.C.§ 1396r–5(e)(2)(C), which places a ceiling on the amount of resources a hearing officer can transfer to the CSRA. The examiner may transfer no more than the amount of resources necessary to provide the community spouse with a MMMNA, which is set at 150% of the federal poverty line. *See* § 1396r–5(d)(3). The transfer of resources before income does not permit a community spouse to live a lavish lifestyle while the government pays for his or her spouse's nursing home care.

## CONCLUSION

¶ 29. Because we conclude that Wisconsin's income-first rule set out in WIS. STAT. § 49.455(8)(d) impermissibly conflicts with federal law, we reverse the order of the circuit court and direct it to remand this matter to DHFS to increase Burnett's CSRA to an

amount, when combined with Burnett's other income, that will permit him to have an income-generating capacity sufficient to meet the MMMNA.

*By the Court.*—Order reversed and cause remanded with directions for further proceedings consistent with this opinion.