# WISCONSIN DEPARTMENT OF HEALTH AND FAMILY SERVICES *v.* BLUMER

No. 00–952.   Argued December 3, 2001—Decided February 20, 2002

474

GINSBURG, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and KENNEDY, SOUTER, THOMAS, and BREYER, JJ., joined. STEVENS, J., filed a dissenting opinion, in which O'CONNOR and SCALIA, JJ., joined, *post*, p. 498.

*Maureen McGlynn Flanagan*, Assistant Attorney General of Wisconsin, argued the cause for petitioner. With her on the briefs was *James E. Doyle*, Attorney General.

*Jeffrey A. Lamken* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Olson, Acting Assistant Attorney General Schiffer, Deputy Solicitor General Kneedler, William Kanter, Bruce G. Forrest, Alex Azar II, Sheree R. Kanner, Henry R. Goldberg, Carole F. Kagan,* and *David R. Smith*.

*Mitchell Hagopian* argued the cause for respondent. With him on the brief were *Eva Shiffrin* and *Sarah Orr*.*

JUSTICE GINSBURG delivered the opinion of the Court.

This case requires interpretation of the "spousal impoverishment" provisions of the Medicare Catastrophic Coverage Act of 1988 (MCCA or Act), 102 Stat. 754, 42 U. S. C. § 1396r–5 (1994 ed. and Supp. V), a complex set of instructions made part of the federal Medicaid statute. The

---

*\*Thomas C. Fox* filed a brief for the American Health Care Association as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for AARP et al. by *Rochelle Bobroff, Bruce Vignery,* and *Michael Schuster;* for the Ohio State Bar Association et al. by *William J. Browning, Eugene Whetzel, Rene H. Reixach,* and *A. Frank Johns;* for SeniorLAW/Legal Action of Wisconsin, Inc., by *Carol J. Wessels;* and for the State Bar of Wisconsin's Elder Law Section by *Sara Buscher* and *Barbara J. Becker*.

A brief of *amicus curiae* was filed for the Medicaid agencies of 14 States by *Charles A. Miller,* joined by the Attorneys General of their respective States as follows: *Bill Pryor* of Alabama, *Carla J. Stovall* of Kansas, *John J. Farmer* of New Jersey, *Wayne K. Stenehjem* of North Dakota, *Betty D. Montgomery* of Ohio, *Paul G. Summers* of Tennessee, *Mark L. Shurtleff* of Utah, and *Christine O. Gregoire* of Washington.

spousal impoverishment provisions permit a spouse living at home (called the "community spouse") to reserve certain income and assets to meet the minimum monthly maintenance needs he or she will have when the other spouse (the "institutionalized spouse") is institutionalized, usually in a nursing home, and becomes eligible for Medicaid.

The Act shelters from diminution a standard amount of assets (called the "community spouse resource allowance," "CSRA," or "resource allowance"). The MCCA allows an increase in the standard allowance if either spouse shows, at a state-administered hearing, that the community spouse will not be able to maintain the statutorily defined minimum level of income on which to live after the institutionalized spouse gains Medicaid eligibility.

In determining whether the community spouse is entitled to a higher CSRA, i. e., to shelter assets in excess of the standard resource allowance, Wisconsin, like a majority of other States, uses an "income-first" method. Under that method, the State considers first whether potential income transfers from the institutionalized spouse, which the MCCA expressly permits, will suffice to enable the community spouse to meet monthly needs once the institutionalized spouse qualifies for Medicaid.

Respondent Irene Blumer, whose Medicaid eligibility was delayed by the application of petitioner Wisconsin Department of Health and Family Services' income-first method, challenges that method as inconsistent with the MCCA provision governing upward revision of the community spouse resource allowance, § 1396r–5(e)(2)(C) (1994 ed.). The Wisconsin Court of Appeals upheld her challenge. We reverse that court's judgment. Neither the text of § 1396r–5(e)(2)(C) nor the structure of the MCCA, we conclude, forbids Wisconsin's chosen approach. Consistent with the position adopted by the Secretary of Health and Human Services, we hold that the income-first method represents a permissible interpretation of the Act.

I

A

The federal Medicaid program provides funding to States that reimburse needy persons for the cost of medical care. See Social Security Act, tit. XIX, as added, 79 Stat. 343, and as amended, 42 U. S. C. § 1396 *et seq.* (1994 ed. and Supp. V). "Each participating State develops a plan containing reasonable standards . . . for determining eligibility for and the extent of medical assistance" within boundaries set by the Medicaid statute and the Secretary of Health and Human Services. *Schweiker* v. *Gray Panthers,* 453 U. S. 34, 36–37 (1981) (internal quotation marks omitted); § 1396a(a)(17) (1994 ed.).[1] In formulating those standards, States must "provide for taking into account only such income and resources as are, as determined in accordance with standards prescribed by the Secretary, *available* to the applicant." § 1396a(a)(17)(B) (emphasis added).

Because spouses typically possess assets and income jointly and bear financial responsibility for each other, Medicaid eligibility determinations for married applicants have resisted simple solutions. See, *e. g., id.,* at 44–48. Until 1989, the year the MCCA took effect, States generally considered the income of either spouse to be "available" to the other. We upheld this approach in *Gray Panthers,* observing that "from the beginning of the Medicaid program, Congress authorized States to presume spousal support." *Id.,* at 44; see *id.,* at 45 (quoting passage from S. Rep. No. 404, 89th Cong., 1st Sess., pt. 1, p. 78 (1965), including statement that "it is proper to expect spouses to support each other").

---

[1] The Secretary has delegated his rulemaking power to the Health Care Financing Administration (HCFA), see Statement of Organization, Functions, and Delegations of Authority for the Dept. of Health and Human Services, Pt. F, 46 Fed. Reg. 13262–13263 (1981), now called the Centers for Medicare and Medicaid Services, see 66 Fed. Reg. 35437 (2001). We nevertheless refer throughout this opinion to the Secretary as the entity charged with interpretive authority.

Similarly, assets held jointly by the couple were commonly deemed "available" in full to the institutionalized spouse.

At the same time, States generally did not treat resources held individually by the community spouse as available to the institutionalized spouse. Accordingly, assets titled solely in the name of the community spouse often escaped consideration in determining the institutionalized spouse's Medicaid eligibility. See H. R. Rep. No. 100–105, pt. 2, pp. 66–67 (1987).

As Congress later found when it enacted the MCCA in 1988, these existing practices for determining a married applicant's income and resources produced unintended consequences. Many community spouses were left destitute by the drain on the couple's assets necessary to qualify the institutionalized spouse for Medicaid and by the diminution of the couple's income posteligibility to reduce the amount payable by Medicaid for institutional care. See id., at 66–68. Conversely, couples with ample means could qualify for assistance when their assets were held solely in the community spouse's name.

In the MCCA, Congress sought to protect community spouses from "pauperization" while preventing financially secure couples from obtaining Medicaid assistance. See id., at 65 (bill seeks to "end th[e] pauperization" of the community spouse "by assuring that the community spouse has a sufficient—but not excessive—amount of income and resources available"). To achieve this aim, Congress installed a set of intricate and interlocking requirements with which States must comply in allocating a couple's income and resources.

Income allocation is governed by §§ 1396r–5(b) and (d). Covering any month in which "an institutionalized spouse is in the institution," § 1396r–5(b)(1) provides that "no income of the community spouse shall be deemed available to the institutionalized spouse." The community spouse's income is thus preserved for that spouse and does not affect

the determination whether the institutionalized spouse qualifies for Medicaid. In general, such income is also disregarded in calculating the amount Medicaid will pay for the institutionalized spouse's care after eligibility is established.

Other provisions specifically address income allocation in the period after the institutionalized spouse becomes Medicaid eligible. Section 1396r–5(b)(2)(A) prescribes, as a main rule, that if payment of income is made solely in the name of one spouse, that income is treated as available only to the named spouse (the "name-on-the-check" rule). Section 1396r–5(d) provides a number of exceptions to that main rule designed to ensure that the community spouse and other dependents have income sufficient to meet basic needs. Among the exceptions, § 1396r–5(d)(3) establishes for the community spouse a "minimum monthly maintenance needs allowance," or MMMNA. The MMMNA is calculated by multiplying the federal poverty level for a couple by a percentage set by the State. Since 1992, that percentage must be at least 150%, §§ 1396r–5(d)(3)(A)–(B), but the resulting MMMNA may not exceed $1,500 per month in 1988 dollars ($2,175 in 2001 dollars), §§ 1396r–5(d)(3)(C), (g).[2]

If the income of the community spouse determined under § 1396r–5(b)(2), which states the "name-on-the-check" rule, is insufficient to yield income equal to or above the MMMNA, § 1396r–5(d)(1)(B) comes into play. Under that provision, the amount of the shortfall is "deducted" from the income of the institutionalized spouse—reducing the amount of income that would otherwise be considered available for the institutionalized spouse's care—so long as that income is actually made available to the community spouse. The

---

[2] The State must also provide for an "excess shelter allowance" if necessary to cover, *inter alia,* unusually high rent or mortgage payments. §§ 1396r–5(d)(3)(A)(ii), (d)(4). Either spouse may request a hearing to seek a higher MMMNA for the community spouse; such an increase will be allowed if the couple establishes "exceptional circumstances resulting in significant financial duress." § 1396r–5(e)(2)(B).

amount thus reallocated from the institutionalized spouse to the community spouse is called the "community spouse monthly income allowance," or CSMIA, § 1396r–5(d)(1)(B). The provision for this allowance ensures that income transferred from the institutionalized spouse to the community spouse to meet the latter's basic needs is not also considered available for the former's care. As a result, Medicaid will pay a greater portion of the institutionalized spouse's medical expenses than it would absent the CSMIA provision.

Resource allocation is controlled by §§ 1396r–5(c) and (f).[3] For purposes of establishing the institutionalized spouse's Medicaid eligibility,[4] a portion of the couple's assets is reserved for the benefit of the community spouse. § 1396r–5(c)(2). To determine that reserved amount (the CSRA), the total of all of the couple's resources (whether owned jointly or separately) is calculated as of the time the institutionalized spouse's institutionalization commenced; half of that total is then allocated to each spouse (the "spousal share"). § 1396r–5(c)(1)(A). The spousal share allocated to the community spouse qualifies as the CSRA, subject to a ceiling of $60,000 indexed for inflation (in 2001, the ceiling was $87,000) and a floor, set by the State, between $12,000 and $60,000 (also indexed for inflation; in 2001, the amounts were $17,400 and $87,000). §§ 1396r–5(c)(2)(B), (f)(2)(A), (g).[5] The CSRA is considered unavailable to the

---

[3] The Act excludes from the definition of "resources" the couple's home, one automobile, personal belongings, and certain other forms of property. §§ 1382b(a) (1994 ed. and Supp. V), 1396r–5(c)(5) (1994 ed.).

[4] Once the institutionalized spouse is determined to be eligible, "no resources [gained by] the community spouse shall be deemed available to the institutionalized spouse." § 1396r–5(c)(4).

[5] As the United States points out, Brief for United States as *Amicus Curiae* 8, n. 4, the MCCA technically defines the CSRA as only a portion of the assets protected for the benefit of the community spouse. Under § 1396r–5(f)(2), the CSRA denotes the amount by which the community spouse's "spousal share" of the couple's resources falls below the resource allowance set by the State pursuant to § 1396r–5(f)(2)(A). Assets cov-

institutionalized spouse in the eligibility determination, but all resources above the CSRA (excluding a small sum set aside as a personal allowance for the institutionalized spouse, currently $2,000, see 20 CFR § 416.1205 (2001)) must be spent before eligibility can be achieved. § 1396r–5(c)(2).

The MCCA provides for a "fair hearing" mechanism through which a couple may challenge the State's determination of a number of elements that affect eligibility for, or the extent of assistance provided under, Medicaid. §§ 1396r–5(e). The dispute in this case centers on § 1396r–5(e)(2)(C), which allows a couple to request a higher CSRA. That section provides in relevant part:

> "If either . . . spouse establishes that the [CSRA] (in relation to the amount of income generated by such an allowance) is inadequate to raise the community spouse's income to the [MMMNA], there shall be substituted, for the [CSRA] under subsection (f)(2) of this section, an amount adequate to provide [the MMMNA]."

If the couple succeeds in obtaining a higher CSRA, the institutionalized spouse may reserve additional resources for posteligibility transfer to the community spouse. The enhanced CSRA will reduce the resources the statute deems

---

ering this shortfall are automatically excluded from consideration in the eligibility determination and transferred to the community spouse after eligibility is achieved. §§ 1396r–5(f)(1), (2).

We observe, however, that the parties here, like the court below, refer to the CSRA as the total resources the community spouse is permitted to retain, an amount generally equal to the spousal share. See Brief for Petitioner 7, n. 6; Brief for Respondent 5; 2000 WI App. 150, ¶ 10, 237 Wis. 2d 810, 816, ¶ 10, 615 N. W. 2d 647, 650, ¶ 10. The Secretary of Health and Human Services employs the same broad definition: According to the Secretary, the CSRA means "the amount of a couple's combined jointly and separately-owned resources . . . allocated to the community spouse and considered unavailable to the institutionalized spouse when determining his or her eligibility for Medicaid." 66 Fed. Reg. 46763, 46768 (2001). We adhere to this common understanding of the CSRA throughout this opinion.

available for the payment of medical expenses; accordingly, the institutionalized spouse will become eligible for Medicaid sooner.

In allocating income and resources between spouses for purposes of § 1396r–5(e)(2)(C), the States have employed two divergent methods: an "income-first" method, used by most States; and a "resources-first" method, preferred by the others. The two methods differ in their construction of the term "community spouse's income" in subsection (e)(2)(C). Under the income-first method, "community spouse's income" is defined to include not only the community spouse's actual income at the time of the § 1396r–5(e) fair hearing, but also a potential posteligibility income transfer from the institutionalized spouse—the CSMIA authorized by § 1396r–5(d)(1)(B), see *supra*, at 481–482. Thus, only if the community spouse's preeligibility income *plus* the CSMIA will fall below the MMMNA may the couple reserve a greater portion of assets through an enhanced CSRA.

The resources-first method, by contrast, excludes the CSMIA from consideration. "Community spouse's income" under that approach includes only income actually received by the community spouse at the time of the § 1396r–5(e) hearing, not any anticipated posteligibility income transfer from the institutionalized spouse pursuant to § 1396r–5(d)(1)(B). If the community spouse's income so defined will fall below the MMMNA, the CSRA will be raised to reserve additional assets sufficient to generate income meeting the shortfall, whether or not the CSMIA could also accomplish that task.

In sum, the income-first method, because it takes account of the potential CSMIA, makes it less likely that the CSRA will be increased; it therefore tends to require couples to expend additional resources before the institutionalized spouse becomes Medicaid eligible.

The Secretary of Health and Human Services has issued several statements supporting the income-first method. Initially, the Secretary interpreted the MCCA as requiring

state hearing officers to use that method. See HCFA, Chicago Regional State Letter No. 51–93 (Dec. 1993), App. to Pet. for Cert. 78a–83a. More recently, the Secretary has concluded that the Act permits both income-first and "some other reasonable interpretation of the law." HCFA, Chicago Regional State Letter No. 22–94, p. 2 (July 1994), App. to Pet. for Cert. 89a.

The Secretary has circulated for comment a proposed rule "allow[ing] States the threshold choice of using either the income-first or resources-first method when determining whether the community spouse has sufficient income to meet minimum monthly maintenance needs." 66 Fed. Reg. 46763, 46765 (2001). The proposed rule details the Secretary's reasons for concluding that the Act does not "clearly requir[e] the use of either [method] to the exclusion of the other." *Id.*, at 46767. Accordingly, "in view of the cooperative federalism considerations embodied in the Medicaid program," *id.*, at 46765, the Secretary found it appropriate to "leave to States the decision as to which alternative to use," *id.*, at 46767.[6]

## B

The facts of this case illustrate the operation of the Act and the different consequences of the income-first and resources-first. approaches. Irene Blumer was admitted to a Wisconsin nursing home in 1994 and applied for Medicaid assistance in 1996 through her husband Burnett. In accord with § 1396r–5(c), the Green County Department of Human Services (County) determined that as of Irene's institutionalization in 1994, the couple's resources amounted to $145,644. Dividing this amount evenly between the Blumers, the

---

[6] Comments on the proposed rule were to be submitted by November 6, 2001. As the Government related at oral argument, however, the Secretary fears that comments have not reached the agency due to the disruption of the Nation's postal system in October and November 2001. See Tr. of Oral Arg. 16–17. It remains unclear when the Secretary will take further action on the proposed rule. See 66 Fed. Reg. 61625 (2001).

County attributed $72,822 to each spouse. Burnett was allocated this $72,822 share as his CSRA,[7] and Irene was entitled to reserve a personal allowance of $2,000, 20 CFR § 416.1205 (2001). Combining these sums, the County determined that the Blumers could retain $74,822 in assets.

The County next found that, as of the date of Irene's application, the Blumers' resources had been reduced from $145,644 to $89,335. That amount exceeded by $14,513 the couple's resource eligibility threshold. The County accordingly concluded that Irene would not be eligible for Medicaid until the couple's assets were spent down to the $74,822 limit.

Seeking to obtain a higher CSRA, Irene requested a hearing. For purposes of the hearing, Burnett's monthly income amounted to $1,639, consisting of $1,015 in Social Security benefits, $309 from an annuity, and $315 generated by the assets protected in his CSRA.[8] Irene argued that because Burnett's monthly income fell below the applicable MMMNA of $1,727, the examiner was obliged to increase his CSRA, thereby protecting additional assets capable of covering the income shortfall.

Excluding Irene's $2,000 personal allowance, the Blumers' total remaining assets exceeded Burnett's $72,822 standard CSRA, as just noted, by $14,513, an amount generating roughly $63 in monthly income. Attributing that income to Burnett would have raised his monthly income to $1,702,

---

[7] Wisconsin sets the CSRA floor at $50,000. Wis. Stat. § 49.455(6)(b)1m (1999–2001). Because Burnett's $72,822 spousal share exceeded that amount but fell below the federally imposed ceiling, which was then $79,020 ($60,000 indexed for inflation to 1996), the spousal share became his CSRA. App. to Pet. for Cert. 28a.

[8] The hearing examiner incorrectly calculated Burnett's relevant monthly income to be $1,702, mistakenly attributing to him all of the $378 in income generated by the full $87,355 in the *couple's* remaining available resources, rather than the $315 yielded by the $72,822 in assets reserved in his CSRA. See *id.*, at 25a; Tr. 8 (Apr. 29, 1997). Although the error does not affect our decision, we use the correct figures (rounded to the nearest dollar) for illustrative purposes.

still \$25 short of the MMMNA. Thus, had the hearing officer applied the resources-first method—addressing Burnett's income shortfall by first reserving additional assets for his benefit—the examiner would have increased Burnett's CSRA to encompass all of the Blumers' remaining available resources, and Irene would have become immediately eligible for Medicaid. The remaining \$25 deficit in Burnett's income could then have been covered posteligibility by a monthly transfer of income (or CSMIA) from Irene, who at the time of the hearing received \$927 per month in Social Security and \$336 from a pension.

Wisconsin, however, has adopted the income-first rule by statute:

> "If either spouse establishes at a fair hearing that the community spouse resource allowance determined under sub. (6)(b) without a fair hearing does not generate enough income to raise the community spouse's income to the [MMMNA] . . . , the department shall establish an amount to be used under sub. (6)(b)3. that results in a community spouse resource allowance that generates enough income to raise the community spouse's income to the [MMMNA] . . . . Except in exceptional cases which would result in financial duress for the community spouse, *the department may not establish an amount to be used under sub. (6)(b)3. unless the institutionalized spouse makes available to the community spouse the maximum monthly income allowance permitted under sub. (4)(b)."* Wis. Stat. § 49.455(8)(d) (1999–2000) (emphasis added).

Applying this rule, the hearing examiner concluded that he was without authority to increase Burnett's CSRA: The difference between Burnett's monthly income and the MMMNA could be erased if, after achieving eligibility, Irene made available to Burnett \$88 per month from her own income. This, the examiner concluded, Irene would be able to do; ac-

cordingly, there was no need to reserve additional assets for Burnett, and no acceleration in Irene's Medicaid eligibility.

The following table illustrates the differences between the income-first and resources-first methods as applied to the Blumers:

| Analysis of the Blumers' Financial Situation | Income First | Resources First |
|---|---|---|
| Initial Resources Allocation: | | |
| Total Resources | $145,644 | $145,644 |
| Burnett's Share | $72,822 | $72,822 |
| Irene's Share | $72,822 | $72,822 |
| Standard Amount of Resources Protected: | | |
| Burnett's Standard CSRA | $72,822 | $72,822 |
| Irene's Personal Allowance | $2,000 | $2,000 |
| Total | $74,822 | $74,822 |
| Assessment of Burnett's Income: | | |
| Pension and Social Security Income | $1,324 | $1,324 |
| Income from Standard CSRA | $315 | $315 |
| Total | $1,639 | $1,639 |
| Wisconsin MMMNA | $1,727 | $1,727 |
| Compared to Burnett's Income | –$1,639 | –$1,639 |
| Income Shortfall | $88 | $88 |
| Satisfying Burnett's Income Shortfall: | | |
| Enhanced CSRA | $0 | $14,513 |
| Income from Enhanced CSRA | n/a | $63 |
| Required Income Transfer from Irene (CSMIA) | $88 | $25 |
| End Result: | | |
| Total Resources Protected | $74,822 | $89,335 |

The hearing examiner's determination was affirmed by the Circuit Court of Green County. The Wisconsin Court of Appeals, however, reversed. Concluding that the MCCA unambiguously mandates the resources-first method, the Wisconsin appellate court declared that the State's income-first statute impermissibly conflicts with federal law. 2000 WI App. 150, 237 Wis. 2d 810, 615 N. W. 2d 647. The Wisconsin Supreme Court denied discretionary review.

The decision of the Wisconsin Court of Appeals, holding the income-first method impermissible and the resources-first method required, accords with the position adopted by Ohio intermediate appellate courts. See, e. g., *Kimnach* v. *Ohio Dept. of Human Servs.*, 96 Ohio App. 3d 640, 647, 645 N. E. 2d 825, 829–830 (1994), appeal not allowed, 71 Ohio St. 3d 1447, 644 N. E. 2d 409 (1995). Most courts to consider the issue, however, including the highest courts of New York and Massachusetts, as well as two Federal Courts of Appeals, have upheld the Secretary's view that the Act permits the income-first method. See *Cleary ex rel. Cleary* v. *Waldman*, 167 F. 3d 801, 805 (CA3), cert. denied, 528 U. S. 870 (1999); *Chambers* v. *Ohio Dept. of Human Servs.*, 145 F. 3d 793, 801 (CA6), cert. denied, 525 U. S. 964 (1998); *Golf* v. *New York State Div. of Soc. Servs.*, 91 N. Y. 2d 656, 662, 697 N. E. 2d 555, 558 (1998); *Thomas* v. *Commissioner of Div. of Medical Assistance*, 425 Mass. 738, 746, 682 N. E. 2d 874, 879 (1997). We granted certiorari to resolve this conflict, 533 U. S. 927 (2001), and now reverse the judgment of the Wisconsin Court of Appeals.

## II

The question presented is whether the income-first prescription of the Wisconsin statute, requiring that potential income transfers from the institutionalized spouse be considered part of the "community spouse's income" for purposes of determining whether a higher CSRA is necessary, conflicts with the MCCA. The answer to that question, the parties agree, turns on whether the words "community spouse's income" in § 1396r–5(e)(2)(C) may be interpreted to include potential, posteligibility transfers of income from the institutionalized spouse permitted by § 1396r–5(d)(1)(B).

In line with the decision of the Wisconsin Court of Appeals, 2000 WI App. 150, ¶ 20, but in conflict with the weight of lower court authority, see, e. g., *Cleary*, 167 F. 3d, at 807; *Chambers*, 145 F. 3d, at 802, Blumer first argues that the

plain meaning of the term "community spouse's income" unambiguously precludes the income-first method. She does not dispute that a monthly allowance regularly transferred from one spouse to the other could qualify as "income" under any relevant definition, but instead focuses on the modifier "community spouse's," contending that "[b]y choosing the possessive . . . Congress clearly expressed its intent that the income *possessed* by the community spouse" is the relevant measure. Brief for Respondent 16. We disagree. Congress' use of the possessive case does not demand construction of "community spouse's income" to mean only income actually possessed by, rather than available or attributable to, the community spouse; to the contrary, the use of the possessive is often indeterminate. See J. Taylor, Possessives in English: An Exploration in Cognitive Grammar 2 (1996) ("[T]he entity denoted by a possessor nominal does not necessarily possess (in the everyday, legalistic sense of the term) the entity denoted by the possessee."); see also *Smiley* v. *Citibank (South Dakota), N. A.*, 517 U. S. 735, 739 (1996) (questioning characterization of a statutory term as unambiguous when its meaning has generated a division of opinion in the lower courts).

Blumer maintains as well that the "design of the Act as a whole" precludes use of the income-first method. *K mart Corp.* v. *Cartier, Inc.*, 486 U. S. 281, 291 (1988). She relies heavily, as did the Wisconsin Court of Appeals, 2000 WI App. 150, ¶¶ 21–23, on the Act's distinction between rules governing the initial Medicaid eligibility determination and those that apply posteligibility to the extent-of-assistance calculation. See Brief for Respondent 17–18. Blumer notes that the (e)(2)(C) hearing to obtain an enhanced CSRA occurs only at the time an eligibility assessment is conducted, while no CSMIA income is transferred until after eligibility has been achieved, see *supra*, at 481–482. This sequence, she contends, shows that Congress intended the CSRA enhance-

ment and the CSMIA to operate at discrete stages: The former remedies a shortfall in the income possessed by the community spouse prior to eligibility, while the latter provides further relief posteligibility if the previous CSRA enhancement proves inadequate. See Brief for Respondent 18. Because the Wisconsin statute requires imputation of the CSMIA to the community spouse *before* additional assets may be reserved, Blumer concludes, the statute reverses the priority established by the MCCA.

In accord with the Secretary, we do not agree that Congress circumscribed the (e)(2)(C) hearing in the manner Blumer urges. Although that hearing is conducted pre-eligibility,[9] its purpose is to anticipate the *posteligibility* financial situation of the couple. The procedure seeks to project what the community spouse's income *will be* when the institutionalized spouse becomes eligible. See Tr. of Oral Arg. 14 (officer conducting (e)(2)(C) hearing makes a calculation that "concerns the post eligibility period"; question is will "the at-home spouse . . . have sufficient income in the post eligibility period, or does the resource allowance need to be jacked up in order to provide that additional income"). The hearing officer must measure that projected income against the MMMNA, a standard that, like the CSMIA, is operative only posteligibility. §§ 1396r–5(b)(2), (d)(3).

In short, if the (e)(2)(C) hearing is properly comprehended as a preeligibility projection of the couple's posteligibility situation, as we think it is, we do not count it unreasonable for a State to include in its estimation of the "community

---

[9] That the hearing must occur preeligibility is dictated by the mechanics of the process; in order to preserve the assets, if any, that will be necessary for the community spouse's support in the posteligibility period, a couple must know in advance what resources it need not and should not expend before the institutionalized spouse becomes Medicaid eligible.

spouse's income" in that posteligibility period an income transfer that may then occur.[10]

Blumer's skewed view of the (e)(2)(C) hearing also underlies the contention, advanced at oral argument, see Tr. of Oral Arg. 6–10, that the income-first method renders meaningless the Act's key prohibition against deeming income of the community spouse available to the institutionalized one. § 1396r–5(b)(1). According to this argument, including the CSMIA as part of the "community spouse's income" under subsection (e)(2)(C) effectively converts some income of the institutionalized spouse into income of the community spouse. And prior to eligibility, the argument continues, all of the institutionalized spouse's income is considered available for medical expenses. § 1396a(a)(10)(A); 42 CFR § 435.120 (2000). Thus, the theory concludes, under income-first the CSMIA would, as a logical matter, be considered

---

[10] Taking issue with this characterization of the (e)(2)(C) hearing, the dissent emphasizes the Wisconsin statute's prescription that no CSRA enhancement will be allowed "unless the institutionalized spouse *makes available* to the community spouse the maximum monthly income allowance permitted," *post*, at 503 (quoting Wis. Stat. § 49.455(8)(d) (1993–1994)) (emphasis supplied by dissent). Only by omitting essential language from the Wisconsin provision can the dissent construe the statute as "requir[ing] a *preeligibility* transfer of income from the institutionalized spouse to the community spouse," *post*, at 503 (emphasis added). The state statute in fact provides that the CSRA may not be enhanced "unless the institutionalized spouse makes available to the community spouse the maximum monthly income allowance *permitted under sub. (4)(b)*." Wis. Stat. § 49.455(8)(d) (emphasis added). Subsection (4)(b) is substantially identical to § 1396r–5(d)(1), the very provision of the MCCA that the dissent finds in *conflict* with § 49.455(8)(d). Like § 1396r–5(d)(1), subsection (4)(b) directs that any income transfer from the institutionalized spouse to the community spouse may occur only "after [the] institutionalized spouse is determined . . . to be eligible." Wis. Stat. § 49.455(4)(b) (1999–2000). Because subsection (4)(b) of the Wisconsin statute therefore would not "permit" a preeligibility income transfer from the institutionalized spouse, § 49.455(8)(d) by its terms does not do so either. In drawing a contrary inference based on an incomplete reading, the dissent, not the Court, "neglects to consider the text of the state statute in issue," *post*, at 502.

both "community spouse's income" and "available" for the institutionalized spouse's medical expenses in clear contravention of subsection (b)(1).

This argument confuses the inclusion of a projected CSMIA in the preeligibility *calculation* of the community spouse's posteligibility income with the actual *transfer* of income contemplated by the CSMIA provision. The (e)(2)(C) hearing is, again, simply a projection of the state of affairs that will exist posteligibility. The theoretical incorporation of a CSMIA into the community spouse's future income at that hearing has no effect on the preeligibility allocation of income between the spouses. A CSMIA becomes part of the community spouse's income only when it is in fact transferred to that spouse, § 1396r–5(d)(1)(B), which may not occur until "[a]fter [the] institutionalized spouse is determined . . . to be eligible." § 1396r–5(d)(1). At that point, the actual CSMIA is deducted from the institutionalized spouse's income, *ibid.*, and is no longer available for medical expenses. Thus, at all times the rule of subsection (b)(1) is honored, for at no time is any income of the community spouse simultaneously deemed available to the institutionalized spouse.[11]

Far from precluding Wisconsin's chosen approach, the MCCA's design offers affirmative support for the permissibility of the income-first method. Subsection (b)(1), pro-

---

[11] Blumer also contends that § 1396r–5(a)(3) forbids the income-first method because that provision expressly leaves in place the existing Supplemental Security Income (SSI) program rules for determining what constitutes income and resources, including the standards and methods used in such determinations. See Brief for Respondent 19–22. In particular, Blumer emphasizes that subsection (a)(3) imposes the SSI requirement, codified at § 1396a(r)(2)(B), that States may not adopt income-assessment standards that reduce the number of people eligible for SSI. See *id.*, at 21. As Wisconsin points out, however, the issue carved out by § 1396r–5(a)(3)—what qualifies as income or resources—is not implicated by this case. Reply Brief 5; see *supra*, at 490. At issue here is the different question, governed entirely by the MCCA, of whether money that is indisputably "income" may be attributed to the community spouse.

hibiting attribution of the community spouse's income to the institutionalized spouse, has no counterpart running in the opposite direction. Indeed, the Act specifically provides for a transfer of income from the institutionalized spouse to the community spouse through the CSMIA. § 1396r–5(d)(1)(B). Mindful of the Medicaid program's background principle that "it is proper to expect spouses to support each other," *Gray Panthers*, 453 U. S., at 45 (quoting S. Rep. No. 404, pt. 1, at 78) (internal quotation marks omitted), we are satisfied that a State reasonably interprets the MCCA by anticipating the CSMIA in the (e)(2)(C) hearing.[12]

---

[12] According to the dissent, anticipating the CSMIA in this manner effectively "mandates an income transfer that Congress left optional," *post*, at 503–504. The dissent presumably means that the CSMIA, once projected as part of the "community spouse's income" in the (e)(2)(C) hearing, must in fact be transferred posteligibility lest the community spouse receive income below the statutorily guaranteed MMMNA. As this case illustrates, however, application of the resources-first method may yield the same situation. If the hearing examiner had granted Irene's request to increase Burnett's CSRA without regard to a potential CSMIA, Burnett's income would still have fallen $25 short of the MMMNA, see *supra*, at 486–487. A posteligibility income transfer in that amount would therefore have been "mandatory" as the dissent understands that term, *post*, at 504. Thus, the dissent's issue is not with the income-first method, but rather with the friction between Congress' decision to guarantee a minimum level of income for the community spouse and its failure to mandate the transfer of income necessary in many cases to realize that guarantee.

Similarly, in faulting the income-first method for the possibility that its projections may prove inaccurate, see *ibid.*, the dissent attacks a problem inherent in the design of the Act itself. As long as the (e)(2)(C) hearing is conducted preeligibility, see *supra*, at 491, n. 9, the hearing examiner must inevitably make predictions, and those predictions "may not ultimately come to fruition," *post*, at 504. Under the resources-first method, just as under income-first, the examiner must decide whether to enhance the CSRA based on speculation about the community spouse's income in the posteligibility period. If that income diminishes unexpectedly, the community spouse may be left without the level of income that the examiner "predicted" at the (e)(2)(C) hearing, and on the basis of which the examiner denied a CSRA enhancement.

We further note that subsection (e), governing fair hearings in general, is not limited to a redetermination of the CSRA. It also permits a hearing if the couple is dissatisfied with:

"(i) the [CSMIA];

"(ii) the amount of monthly income otherwise available to the community spouse . . . ;

"(iii) the computation of the spousal share of resources under subsection (c)(1) of this section; [and]

"(iv) the attribution of resources under subsection (c)(2) of this section." § 1396r–5(e)(2)(A).

Given that the CSMIA itself may be adjusted in a fair hearing under subsection (e)(2)(A)(i), we cannot conclude that the States are forbidden to consider the projected CSMIA in the related hearing, authorized by subsection (e)(2)(A)(v), to increase the CSRA. Accord, *Cleary*, 167 F. 3d, at 810.

## III

We thus hold that the income-first method is a permissible means of implementing the Act. The parties here have not also disputed the permissibility of the resources-first approach. We therefore do not definitively resolve that matter, although we note that the leeway for state choices urged by both Wisconsin and the United States is characteristic of Medicaid.

The Medicaid statute, in which the MCCA is implanted, is designed to advance cooperative federalism. See *Harris* v. *McRae*, 448 U. S. 297, 308 (1980). When interpreting other statutes so structured, we have not been reluctant to leave a range of permissible choices to the States, at least where the superintending federal agency has concluded that such latitude is consistent with the statute's aims. In *Batterton* v. *Francis*, 432 U. S. 416, 429 (1977), for example, we upheld a regulation promulgated by the Secretary of Health, Education, and Welfare affording the States dis-

cretion in the implementation of the Aid to Families with Dependent Children (AFDC) unemployed parent program. The challenged regulation allowed States to cover or exclude from coverage persons whose unemployment resulted from participation in a labor dispute or whose conduct would disqualify them for benefits under the State's compensation law. Noting that the AFDC program involved the "concept of cooperative federalism," *id.*, at 431, we concluded that the Secretary had the authority to "recognize some local options in determining . . . eligibility," *id.*, at 430. Similarly, in *Lukhard* v. *Reed*, 481 U. S. 368 (1987), a plurality of this Court concluded that Virginia's policy of treating personal injury awards as income rather than resources under the AFDC program was reasonable and consistent with federal law, see *id.*, at 377–381. The superintending federal agency, the plurality pointed out, had for many years permitted Virginia's choice while allowing other States to treat such awards as resources. *Id.*, at 378.

The Secretary of Health and Human Services, who possesses the authority to prescribe standards relevant to the issue here, § 1396a(a)(17),[13] has preliminarily determined that the MCCA permits both the income-first and resources-first methods. See 66 Fed. Reg. 46763, 46767 (2001); HCFA, Chicago Regional State Letter No. 22–94, at 2, App. to Pet.

---

[13] Blumer argues that § 1396r–5(a)(1) divests the Secretary of the authority granted under § 1396a(a)(17) to prescribe standards governing the allocation of income and resources for Medicaid purposes. See Brief for Respondent 39. Subsection (a)(1) states that the *eligibility* provisions of the MCCA "supersede any other provision of this subchapter (including sections 1396a(a)(17) and 1396a(f) of this title) which is inconsistent with them," but says nothing about the regulatory authority of the Secretary under § 1396a(a)(17). We have long noted Congress' delegation of extremely broad regulatory authority to the Secretary in the Medicaid area, see *Schweiker* v. *Gray Panthers*, 453 U. S. 34, 43 (1981); *Batterton* v. *Francis*, 432 U. S. 416, 425 (1977), and we will not conclude that Congress implicitly withdrew that authority here.

for Cert. 89a.[14] In a recently proposed rule, the Secretary declared that "in the spirit of Federalism," the Federal Government "should leave to States the decision as to which alternative [income-first or resources-first] to use." 66 Fed. Reg. 46763, 46767 (2001).

The Secretary's position warrants respectful consideration. Cf. *United States* v. *Mead Corp.*, 533 U. S. 218 (2001); *Thomas Jefferson Univ.* v. *Shalala*, 512 U. S. 504, 512 (1994) (reliance on Secretary's "significant expertise" particularly appropriate in the context of "a complex and highly technical regulatory program" (internal quotation marks omitted)); *Gray Panthers*, 453 U. S., at 43–44 (Secretary granted "exceptionally broad authority" under the Medicaid statute). As Blumer acknowledges, Brief for Respondent 31–32, the MCCA affords large discretion to the States on two related variables: the level of the MMMNA accorded the community spouse, § 1396r–5(d)(3), see *supra*, at 481, and the amount of assets the couple is permitted to retain, § 1396r–5(f)(2)(A), see *supra*, at 482–483. Nothing in the Act indicates to us that similar latitude is inappropriate with respect to the application of subsection (e)(2)(C).

Eliminating the discretion to choose income-first would hinder a State's efforts to "strik[e] its own balance" in the implementation of the Act. *Lukhard*, 481 U. S., at 383. States that currently allocate limited funds through the income-first approach would have little choice but to offset the greater expense of the resources-first method by reducing the MMMNA or the standard CSRA. Such an alteration would benefit couples seeking Medicaid who possess sig-

---

[14] Contrary to the dissent's suggestion, *post*, at 505, the Secretary has never wavered from his position that the income-first method represents at least a permissible interpretation of the Act. See HCFA, Chicago Regional State Letter No. 51–93 (Dec. 1993), App. to Pet. for Cert. 78a–83a; HCFA, Chicago Regional State Letter No. 22–94, p. 2 (July 1994), App. to Pet. for Cert. 89a; 66 Fed. Reg. 46763, 46765 (2001).

nificant resources—"not . . . a lot of people" by Blumer's own account, Tr. of Oral Arg. 38—while offering nothing to, and perhaps disadvantaging, those who do not, couples for whom the other variables provide the primary protection against spousal impoverishment. Blumer would thus have us conclude that Congress pushed States toward altering standards that affect every person covered by the MCCA in order to install, without any increased spending, a resources-first rule that affects only those whose assets exceed the formula resources allowance. We perceive nothing in the Act contradicting the Secretary's conclusion that such a result is unnecessary and unwarranted.

\*      \*      \*

For the reasons stated, the judgment of the Wisconsin Court of Appeals is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE STEVENS, with whom JUSTICE O'CONNOR and JUSTICE SCALIA join, dissenting.

The Medicare Catastrophic Coverage Act of 1988 (MCCA), 42 U. S. C. § 1396r–5 (1994 ed. and Supp. V), provides important protections for married couples who need financial assistance when one spouse is institutionalized in a nursing home. Eligibility for financial assistance in paying nursing home costs is limited by a ceiling on the couple's resources and a ceiling on their income. The MCCA responded to pre-1988 eligibility rules that often required both spouses to deplete their combined resources before an institutionalized spouse became eligible for benefits. In order to prevent the "pauperization" of the spouse who remains at home (the "community spouse"), the 1988 Act gives couples two important rights that are implicated by this case. H. R. Rep.

No. 100–105, pt. 2, pp. 66–67 (1987). The first is a *preeligibility* right of the spouse who remains at home (the "community spouse") to retain a defined share of their joint resources, called the "community spouse resource allowance" (CSRA).[1] The second is a *posteligibility* right of the institutionalized spouse to use a defined share of her income for purposes other than paying for the cost of her care.

The two statutory rights involved in this case are designed, in part, to assure that the community spouse's income may be maintained at a minimum level—the "minimum monthly maintenance needs allowance" (MMMNA).[2] To safeguard these rights and this minimum level of subsistence for the community spouse, the statute provides for a "fair hearing," at which a couple seeking medical assistance for an institutionalized spouse may challenge several calculations that are used to determine eligibility for Medicaid. 42 U. S. C. § 1396r–5(e)(2) (1994 ed.). The determination of the CSRA is one such calculation that may be challenged. § 1396r–5(e)(2)(A)(v).

During this preeligibility hearing, if the institutionalized spouse has income-producing resources and the community spouse's income is below the MMMNA, the provision in issue in this case, § 1396r–5(e)(2)(C), is applicable. By its terms, it allows the institutionalized spouse to transfer sufficient resources to the community spouse to provide him with an

---

[1] A portion of the couple's assets is allocated to the community spouse pursuant to a formula found in 42 U. S. C. § 1396r–5(C)(1)(A) (1994 ed.). This allocated amount, the CSRA, is reserved for the benefit of the community spouse and is not considered in establishing assistance eligibility for the institutionalized spouse. § 1396r–5(c)(2).

[2] Section 1396r–5(d)(3) sets the boundaries of the MMMNA. Although this provision grants States some flexibility in setting the MMMNA, it must be set no lower than 150% of the poverty level for a family of two. In 2001, States could set the MMMNA between $1,406.25 and $2,175 per month. Wisconsin established its MMMNA at $1,935.

income equal to the MMMNA. Since only those resources that remain with the institutionalized spouse are counted for eligibility purposes, § 1396r–5(e)(2)(C) enables some institutionalized spouses who would otherwise be ineligible to qualify for financial assistance.

The text of § 1396r–5(e)(2)(C) is straightforward. As its caption indicates, it deals only with the "[r]evision of community spouse resource allowance" and it is applicable when an eligibility determination is made. It provides:

> "If either such spouse establishes that the community spouse resource allowance (in relation to the amount of income generated by such an allowance) is inadequate to raise the community spouse's income to the minimum monthly maintenance needs allowance, there shall be substituted, for the community spouse resource allowance under subsection (f)(2) of this section, an amount adequate to provide such a minimum monthly maintenance needs allowance."

Thus, under the plain language of the statute, if the CSRA that has been calculated in accordance with § 1396r–5(c)(1)(A) is insufficient to raise the community spouse's income to the MMMNA level, there "shall be substituted" a new CSRA that will produce sufficient income. § 1396r–5(e)(2)(C).

With respect to income, the sole provision in the federal statute that authorizes a transfer of income from the institutionalized spouse to the community spouse applies only *after* the eligibility determination has been made. § 1396r–5(d)(1). It authorizes the institutionalized spouse to use some of her income to take care of her own needs, to provide support for the community spouse when his income is below the MMMNA, and to help other family members before paying for her care. But as the text of the provision expressly states, it only applies "[a]fter an institutionalized

spouse is determined or redetermined to be eligible for medical assistance."[3]

Wisconsin has passed a statute that prohibits the resource transfer authorized by § 1396r–5(e)(2)(C) unless the institutionalized spouse first transfers any available income to the community spouse.[4] Unless this prohibition is authorized by federal law, it is plainly invalid because it qualifies the federal right created by § 1396r–5(e)(2)(C).

There are two possible bases for arguing that the Wisconsin statute is consistent with § 1396r–(e)(2)(C): first, that despite the express limitation in § 1396r–5(d) to deductions authorized "[a]fter an institutionalized spouse is determined or redetermined to be eligible," Congress really meant "before or after"; and second, that when Congress used the term "community spouse's income" in § 1396r–5(e)(2)(C), it really

---

[3] "Allowances to be offset from income of institutionalized spouse

"After an institutionalized spouse is determined or redetermined to be eligible for medical assistance, in determining the amount of the spouse's income that is to be applied monthly to payment for the costs of care in the institution, there shall be deducted from the spouse's monthly income the following amounts in the following order:

"(A) A personal needs allowance (described in section 1396a(q)(1) of this title), in an amount not less than the amount specified in section 1396a(q)(2) of this title.

"(B) A community spouse monthly income allowance (as defined in paragraph (2)), but only to the extent income of the institutionalized spouse is made available to (or for the benefit of) the community spouse.

"(C) A family allowance, for each family member. . . ." § 1396r–5(d)(1).

[4] Wisconsin Stat. § 49.455(8)(d) (1993–1994) provides in part:

"Except in exceptional cases which would result in financial duress for the community spouse, the department may not establish an amount to be used under sub. (6)(b)3. unless the institutionalized spouse makes available to the community spouse the maximum monthly income allowance permitted under sub. (4)(b) or, if the institutionalized spouse does not have sufficient income to make available to the community spouse the maximum monthly income allowance permitted under sub. (4)(b), unless the institutionalized spouse makes all of his or her income . . . available to the community spouse . . . ."

meant "community spouse's income plus any deduction from the institutionalized spouse's income that may in the future be made available to him." As is clear, both of these arguments require altering the plain text of the statute.

Rather than admitting that its reading strains the text of the MCCA, the Court engages in an analytical sleight of hand: It conceives of the transfer of income that is commanded by the Wisconsin statute as a condition of eligibility, not as a *required* transfer, but only as a *prediction* of things to come. *Ante,* at 491–492 ("In short, if the (e)(2)(C) hearing is properly comprehended as a preeligibility projection of the couple's posteligibility situation, as we think it is, we do not count it unreasonable for a State to include in its estimation of the 'community spouse's income' in that posteligibility period an income transfer that will then occur"). The Court's temporal manipulation of the § 1396r–5(e)(2)(C) hearing is innovative; but it is wrong for at least three reasons.

First, in speculating that Wisconsin does not actually require a preeligibility transfer, but only predicts a future income transfer, the Court neglects to consider the text of the state statute in issue. In holding that Wisconsin's "income-first" approach is permissible, the Court states: "The *theoretical* incorporation of a CSMIA [Community Spouse Monthly Income Allowance] into the community spouse's future income at that hearing has no effect on the preeligibility allocation of income between the spouses. *A CSMIA becomes part of the community spouse's income only when it is in fact transferred to that spouse, § 1396r–5(d)(1)(B), which may not occur until '[a]fter [the] institutionalized spouse is determined . . . to be eligible.'* § 1396r–5(d)(1)." *Ante,* at 493 (emphasis added). The Court's own statement, which replaces the statutory phrase *"made available to"* from § 1396r–5(d)(1)(B) with the phrase "transferred to," exposes precisely why the Wisconsin statute is in conflict with the MCCA. As the text of the Wisconsin statute makes clear, there is nothing "theoretical" about the income

transfer that it requires: "[T]he department may not [sub-stitute an increased CSRA] unless the institutionalized spouse *makes available* to the community spouse the maximum monthly income allowance permitted." Wis. Stat. § 49.455(8)(d) (1999–2000) (emphasis added). The state statute requires that an institutionalized spouse "make available" income to the community spouse. In other words, Wisconsin requires a preeligibility transfer of income from the institutionalized spouse to the community spouse. Because 42 U. S. C. § 1396r–5(d)(1) permits the income transfer to take place only after eligibility has been established, the Wisconsin statue is in conflict with the plain language of the MCCA.[5]

Second, although the MCCA permits an institutionalized spouse to transfer income to the community spouse after eligibility has been established, it by no means requires that she do so.[6] Thus, by requiring the CSMIA transfer, and therefore not increasing the CSRA to meet the community spouse's income needs, the Wisconsin statute mandates an

---

[5] The Court asserts in response that the dissent fails to consider that the Wisconsin statute only requires the institutionalized spouse to make available that which she is "permit[ed]" to make available pursuant to subsection (4)(b). *Ante*, at 492, n. 10. But subsection (4)(b), which is substantially identical to § 1396r–5(d)(1), describes the amount of income that can be made available posteligibility, whereas subsection (8)(d) of the Wisconsin statute requires that it be made available as a condition of eligibility. In overlooking the difference between the permissive character of the federal provision and the mandatory character of the Wisconsin statute, the Court's response continues to ignore the text of the Wisconsin statute.

[6] Counsel for the Wisconsin Department of Health and Family Services conceded at oral argument that the income transfer is not required. Tr. of Oral Arg. 14 ("It doesn't explicitly require the transfer"). The Court itself waffles between describing the income transfer as something that has the "potential" to occur, *ante*, at 489, and something that "will be," *ante*, at 491. Nevertheless, the Court's analysis of the 42 U. S. C. § 1396r–5(e)(2)(C) hearing clearly contemplates a mandatory posteligibility transfer.

income transfer that Congress left optional. Furthermore, if the Wisconsin statute could be interpreted to require only a prediction, rather than a mandatory preeligibility transfer, there are several plausible reasons why such a "prediction" may not ultimately come to fruition. For example, the institutionalized spouse might choose not to contribute to the support of the community spouse. Alternatively, the institutionalized spouse's income could fluctuate over time and may not in a given month be sufficient to augment the community spouse's monthly income. Finally, a hearing examiner's finding of ineligibility—based on a fictional prediction that a posteligibility transfer of income would occur—might (as it did in this case) actually prevent the posteligibility transfer from occurring.[7] If any of these events occurs, a primary purpose of the statute—ensuring the financial security of the community spouse—will have been undermined. Thus, either the Wisconsin statute mandates the income transfer, in which case it contradicts the MCCA, or it diminishes the § 1396r–5(e)(2)(C) hearing into a thought experiment that is inconsistent with the purpose of the statute.

Third, an important posteligibility provision of the statute, which expresses the "name-on-the-check" policy of the MCCA, also exposes why the Wisconsin statute is in conflict with the federal one. Section 1396r–5(b)(2)(A)(i) states: "[Posteligibility,] if payment of income is made solely in the name of the institutionalized spouse or the community spouse, the income shall be considered available only to that

---

[7] Under the hearing examiner's ruling in this case, the predicted posteligibility transfer of income could not occur because he found respondent ineligible for assistance. It is ironic, to say the least, that the predicate for the so-called "income first" approach is a hypothetical transfer of income that is actually precluded by the application of that approach. The effect of the Wisconsin statute in this case is to preclude the reallocation of resources that (a) is expressly authorized by § 1396r–5(e)(2)(C), (b) would establish respondent's eligibility, and (c) make it possible for the posteligibility transfer to take place.

respective spouse." By mandating an income transfer from the institutionalized spouse to the community spouse, the Wisconsin statute effectively treats the institutionalized spouse's income as that of the community spouse, and, therefore, violates the prohibition of § 1396r–5(b)(2)(A)(i).

As a final matter, the Court pays "respectful consideration" to an opinion letter and policy memoranda in which the Secretary of Health and Human Services "'in the spirit of Federalism'" has allowed the States to use either an income-first or a resources-first approach. *Ante,* at 497. The weight that should be accorded to such a document depends "'upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade.'" *United States* v. *Mead Corp.,* 533 U. S. 218, 228 (2001). The Secretary has taken inconsistent positions on this issue over time, see App. to Pet. for Cert. 78a–90a, and the current opinion letter offers no analysis of the potentially conflicting provisions in the federal and state statutes. It is devoid of any "'power to persuade.'"

The Court concludes its opinion with an explanation of why the income-first rule may represent a better policy choice than the resources-first rule. It is not, however, a policy choice that Congress made. Indeed, the fact that the text of the federal statute expressly authorizes the resources-first approach without mentioning the income-first rule commanded by the Wisconsin statute, at the very least, identifies a congressional preference for the former.

This statute is not ambiguous. The resource adjustment authorized by § 1396r–5(e)(2)(C) is not conditioned on any prior or predicted transfer of income. The state statute imposing that condition is therefore invalid. Because I agree with the analysis of the statute in the opinion of the Wisconsin Court of Appeals, I would affirm its judgment. I therefore respectfully dissent.