919 So.2d 512 (2005)
Mildred M. FELDMAN, Appellant,
v.
DEPARTMENT OF CHILDREN AND FAMILIES, Appellee.
No. 1D04-4914.
District Court of Appeal of Florida, First District.
December 14, 2005.
Rehearing Denied February 1, 2006.
*513 Mary L. Wakeman of McConnaughhay, Duffy, Coonrod, Pope & Weaver, P.A., Tallahassee, for Appellant.
Terry P. Verduin, Department of Children and Families, West Palm Beach, for Appellee.
ERVIN, J.
This is an appeal from a final order of a hearing officer of the Department of Children and Families (DCF), denying the application of appellant, Mildred M. Feldman (institutionalized spouse), for institutional nursing care Medicaid benefits, after attributing assets to her which she had transferred to her spouse. We affirm.
On February 4, 2004, while Mrs. Feldman resided at a nursing home in south Florida, she signed an assignment of rights to support, which transferred her right of support to DCF. On the same date, her husband, Abraham Feldman (community spouse), signed a notice of spousal refusal to support. Thereafter, on March 11, 2004, Mrs. Feldman transferred approximately $227,000 in shares of stock to her husband and simultaneously applied for Medicaid's institutional care program (ICP) with DCF. Following the application, on March 19, 2004, Mr. Feldman signed another notice of spousal refusal to support, and Mrs. Feldman signed a second assignment of rights to support, both notifying DCF that they had withdrawn the prior forms they had signed, and wanted to replace them with the later forms.
In reviewing the application for ICP benefits, DCF determined that any assets which Mrs. Feldman had transferred to her community spouse following the date of his initial notice of refusal to support must be deemed as an ineligible transfer; therefore, the value of the stock was included within Mrs. Feldman's assets, making her ineligible for Medicaid ICP benefits. Mrs. Feldman requested an administrative hearing to review the denial of her application, and, following the hearing, an officer of the DCF Office of Appeal Hearings entered an order denying the appeal.
Appellant argues that nothing in the statutes, rules, regulations or DCF policy manual prohibits an institutionalized spouse from transferring assets to her spouse after the latter executes a notice of spousal refusal to support; that, in fact, the regulations and policy manual authorize such interspousal transfers and indicate they will not affect the institutionalized spouse's eligibility for ICP Medicaid. She contends that DCF's denial of her application was based solely on a departmental memorandum precluding an institutionalized spouse's transfer of assets to a community spouse after the date he signed a notice of spousal refusal to support the institutionalized spouse, and because the memorandum satisfied the definition of "rule," as provided in section 120.52(15), Florida Statutes, it was of no force and effect because it was unadopted. It is important to note that Mrs. Feldman's argument is based exclusively on the conveyance of the shares of stock to her husband, *514 assets that are readily convertible into cash, which clearly involved no trust, and which she admits she conveyed for less than their fair market value during the "look-back" period.[1]
We cannot agree with appellant's argument, which focuses upon only part of the entire fabric governing an institutionalized spouse's eligibility for ICP benefits. It is true that section 1640.0609.04 of the Florida Department of Children and Families, Economic Self-Sufficiency Public Assistance Policy Manual specifically provides, without any limitation, that an interspousal transfer made on or after October 1, 1989, is an allowable transfer, and no period of ineligibility will be imposed. This provision, however, was obviously established for the purpose of implementing Congressional policy governing transfer of assets provided in 42 U.S.C. § 1396p(c)(2)(B)(i), stating that if an institutionalized individual disposes of assets for less than fair market value on or after the look-back date, such individual is ineligible for nursing-facility services unless the assets were, among other things, "transferred to the individual's spouse or to another for the sole benefit of the individual's spouse."
On its face, the above exception to ineligibility offers strong support for Mrs. Feldman's contentions. Unfortunately for her position, however, it cannot be read in isolation from other pertinent language in the Social Security Act, which must be construed in its entirety. As was observed in Cleary v. Waldman, 959 F.Supp. 222, 228-29 (D.N.J.1997), affirmed, 167 F.3d 801 (3d Cir.1999) (citation omitted):
The Medicaid Act contains complex, interrelated provisions, and it would be foolhardy to impute a plain meaning to any of its provisions in isolation. A statute must be read as a whole; words depend upon context; "they have only a communal existence; and not only does the meaning of each interpenetrate the other, but all in their aggregate take their purport from the setting in which they are used." Thus it is necessary to examine the origins and purposes of the MCCA [Medicare Catastrophic Coverage Act] as well as the structure and language of all of its provisions.
It is clear that Congress did not intend for the provisions of section 1396p to be considered separately from those in 42 U.S.C. § 1396r-5, the Medicare Catastrophic Coverage Act of 1988 (MCCA). As explained in Wisconsin Department Health and Family Services v. Blumer, 534 U.S. 473, 479-80, 122 S.Ct. 962, 151 L.Ed.2d 935 (2002), before the enactment of the MCCA, the states had generally considered assets that married couples jointly held were fully available to the institutionalized spouse, while resources the community spouse held individually were deemed unavailable to the other. Thus, the institutionalized spouse's eligibility for ICP Medicaid could be accomplished by a transfer of his or her assets to the community spouse, regardless of the couple's financial worth. As a consequence, assets titled solely in the name of the community spouse were not considered when determining the Medicaid eligibility of the institutionalized spouse. Id. at 480, 122 S.Ct. 962.
By adopting the MCCA, Congress sought to protect community spouses from becoming impoverished, and to bar financially secure couples from Medicaid assistance. Id. In order to establish an institutionalized *515 spouse's Medicaid eligibility, a portion of the couple's assets is retained to benefit the community spouse, calculated by adding up the couple's joint and individual resources as of the commencement of the institutionalized spouse's institutionalization, and allocating half of the total to each spouse. Id. at 482, 122 S.Ct. 962. The share allocated to the community spouse is the community spouse resource allocation (CSRA), subject to a ceiling and a floor, which amounts were indexed for inflation.[2]Id.
When determining eligibility, the CSRA is not considered available to the institutionalized spouse, but all resources above the CSRA must be spent for such spouse to be eligible. Id. at 482-83, 122 S.Ct. 962. Although the determination of a couple's assets and the CSRA is based upon the first period of continuous institutionalization of the institutionalized spouse, the spouse's ultimate eligibility for benefits is based upon the couple's assets at the time of the application for Medicaid benefits, pursuant to the spousal impoverishment provision of the MCCA. A.K. v. Div. of Med. Assistance & Health Servs., 350 N.J.Super. 175, 794 A.2d 835, 842 (2002). As explained in Estate of Atkinson v. Minnesota Department of Human Services, 564 N.W.2d 209, 214-15 (Minn.1997), eligibility for Medicaid ICP benefits requires a two-step process: the couple's assets are assessed as of the first period of continuous institutionalization of the institutionalized spouse in order to determine spousal share (CSRA), and the couple's total assets are again assessed at the time of the application for Medicaid in order to determine the spouse's eligibility.
If in a situation as here, a Medicaid application is made following the first period of continuous institutionalization, the valuation of the couple's assets is made as of the date of application. This is the procedure followed by Florida Administrative Code Rule 65A-1.712(4)(b), which provides that at the time of a Medicaid application, only countable resources which exceed the CSRA provided in 42 U.S.C. § 1396r-5 are considered available to the institutionalized spouse. Because the Feldmans' total assets exceeded the CSRA when Mrs. Feldman applied for benefits, the excess amount was required to be assessed to her.
There is, perhaps, an even more compelling reason why DCF's denial of Mrs. Feldman's application for Medicaid benefits should be approved. In McNamara v. Ohio Department of Human Services, 139 Ohio App.3d 551, 744 N.E.2d 1216 (2000), at the time the institutionalized spouse entered a nursing home in 1997, the married couple's assets were assessed at $256,130.87. In 1998, the community spouse created a spousal annuity trust for the sole benefit of himself and transferred over $221,000 of spousal assets to the trust. Id. at 1217. Shortly thereafter, the institutionalized spouse applied for Medicaid benefits, which the Ohio Department of Human Services (ODHS) denied, and in affirming the agency's ruling that the institutionalized spouse was not eligible to receive nursing-home vendor payments as a result of the transfer of the couple's assets into a trust for less than fair market value, the appellate court made the following pertinent observations:
Leaving aside the parties' arguments regarding whether the trust satisfied the sole benefit requirement, we conclude *516 that there is a more fundamental flaw in the McNamaras' argument. Section 1396r-5(a)(1), Title 42, U.S.Code, states:
"In determining the eligibility for medical assistance of an institutionalized spouse * * *, the provisions of this section supersede any other provision of this subchapter (including sections 1396a(a)(17) and 1396a(f) of this title) which is inconsistent with them."
The subchapter referred to is Subchapter XIX  Grants to States for Medical Assistance Programs  and, therefore, is inclusive of all of Section 1396, Title 42, U.S.Code. It follows then that the CSRA provision contained in Section 1396r-5(f) supersedes any inconsistent provision in Section 1396p(c). As ODHS points out, if Section 1396p(c)(2)(B), which has been adopted in this state as Ohio Adm.Code 5101:1-39-078(A)(2), is construed to allow an unlimited transfer of resources between spouses, then the CSRA limits established under Section 1396r-5(f), and adopted in this state as Ohio Adm.Code 5101:1-39-36, will be rendered a nullity. Accordingly, we hold that pursuant to the supersession clause of Section 1396r-5(a)(1), the amount of funds that one person may transfer to his or her spouse under Section 1396p(c)(2)(B) is limited to the maximum amounts the community spouse may retain under the CSRA provision in Section 1396r-5(f).
Id. at 1220.
Similarly, we consider that if couples like the Feldmans are permitted to make unlimited transfers of resources between themselves pursuant to section 1396p(c)(2)(b), the CSRA provisions contained in section 1396r-5 would be rendered meaningless and would frustrate one of the two dual goals leading to the adoption of the MCCA: To close loopholes that had previously existed in the Act allowing financially secure married couples to seek and obtain public poverty assistance. Therefore, because Mrs. Feldman transferred $227,000 in shares of stock to her husband as of the same date she applied for ICP benefits with DCF, those assets were correctly considered as included within the total of all the couple's resources, and, because that amount exceeded the CSRA, the denial of the application is
AFFIRMED.
BARFIELD and VAN NORTWICK, JJ., concur.
NOTES
[1] Sections 1640.0607 and 1640.0608 of the Florida Department of Children & Families Economic Self-Sufficiency Public Assistance Policy Manual create a presumption of ineligibility as to the transfer of certain assets during the look-back period, i.e., 36 months before the individual applies for ICP assistance.
[2] At the time of the Act's creation, the floor was $12,000, and the ceiling $60,000. 42 U.S.C. §§ 1396r-5(c)(2)(B), -5(f)(2)(A), -5(g).